RON BENDER (SBN 143364)
MONICA Y. KIM (SBN 180139)
LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
10250 Constellation Blvd., Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: rb@lnbrb.com; myk@lnbrb.com

Attorneys for Chapter 11 Debtor and Plan Proponent

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# (LOS ANGELES DIVISION)

| | |
|---|---|
| In re:<br><br>TITLE GUARANTEE BUILDING OWNER, LLC, a Delaware limited liability company,<br><br>    Debtor and Debtor in Possession. | Case No. 2:09-bk-13950-BR<br><br>Chapter 11<br><br>**SECOND AMENDED DISCLOSURE STATEMENT DESCRIBING DEBTOR'S SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION**<br><br>**Disclosure Statement Hearing**:<br>Date: October 27, 2009<br>Time: 10:00 a.m.<br>Place: Courtroom 1668<br>      255 E. Temple St.<br>      Los Angeles, CA<br><br>**Plan Confirmation Hearing:**<br>Date: [TO BE SET]<br>Time: [TO BE SET]<br>Place: Courtroom 1668<br>      255 E. Temple St.<br>      Los Angeles, CA |

1

# TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................................ 2

    A.  Purpose of this Document ................................................................................. 2

    B.  Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing........... 4

        1.  Time and Place of the Confirmation Hearing ........................................... 4
        2.  Deadline For Voting For or Against the Plan ........................................... 4
        3.  Deadline for Objecting to the Confirmation of the Plan........................... 4
        4.  Identity of Person to Contact for More Information
           Regarding the Plan .................................................................................. 5

    C.  Disclaimer ....................................................................................................... 5

II.  BACKGROUND ....................................................................................................... 5

    A.  What follows is a brief summary of the dates and circumstances that led
        the Debtor to file its bankruptcy ...................................................................... 5

        1.  The Debtor's Business ............................................................................ 5
        2.  The Bank of America Senior Loans and Mezzanine Junior Loans ........ 12
        3.  State Court Litigation with Daniel Swartz and Related Individuals
           and Entities .......................................................................................... 14

    B.  Events Occurring After Bankruptcy Filing ...................................................... 16

        1.  Bankruptcy Court Litigation with Daniel Swartz and Related
           Individuals and Entities......................................................................... 16
        2.  Employment of Professionals ................................................................ 17
        3.  Motions Filed by the Bank for Determination of Debtor's Case as
           "Single Asset Real Estate" Case and for Relief From the
           Automatic Stay...................................................................................... 18
        4.  Actions Taken by Certain Mechanics Lienholders ................................. 20
        5.  Leasing Activities of the Property .......................................................... 23
        6.  Motion for Extension of Debtor's Exclusive Period to Obtain
           Acceptances of its Plan ......................................................................... 24

    C.  Summary of Debtor's Plan.............................................................................. 25

III.  SUMMARY OF PLAN ........................................................................................... 30

    A.  What Creditors and Interest Holders Will Receive Under The Plan ................. 30

PRINTED ON

RECYCLED PAPER

B.      Unclassified Claims .................................................................. 30

        1.      Administrative Expenses ............................................. 30
        2.      Priority Tax Claims .................................................... 31

C.      Classified Claims and Interests ................................................ 32

        1.      Class of Secured Claims ............................................ 32
        2.      Classes of Priority Unsecured Claims ....................... 34
        3.      Class of General Unsecured Claims .......................... 35
        4.      Class of Interest Holders ........................................... 36

D.      Means of Effectuating the Plan ................................................ 36

        1.      Funding for the Plan .................................................. 36
        2.      Post-Confirmation Management ................................ 37
        3.      Disbursing Agent ....................................................... 38
        4.      Objections to Claims .................................................. 38
        5.      Interest Pending Allowance of Claims ...................... 38
        6.      Distributions to be Made Pursuant to the Plan .......... 39
        7.      Exculpations and Releases ......................................... 40
        8.      Injunctions ................................................................. 40

E.      Risk Factors ............................................................................ 41

F.      Other Provisions of the Plan ................................................... 43

        1.      Executory Contracts and Unexpired Leases .............. 43
                a) Assumptions ........................................................ 43
                b) Rejections ........................................................... 43
        2.      Changes in Rates Subject to Regulatory Commission Approval ........... 44
        3.      Retention of Jurisdiction ........................................... 44

G.      Tax Consequences of Plan ...................................................... 46

IV.     CONFIRMATION REQUIREMENTS AND PROCEDURES ..................................... 47

A.      Who May Vote or Object ........................................................ 48

        1.      Who May Object to Confirmation of the Plan ........... 48
        2.      Who May Vote to Accept/Reject the Plan ................. 48
                a)  What Is an Allowed Claim/Interest ...................... 48
                b)  What Is an Impaired Claim/Interest ..................... 49
        3.      Who Is <u>Not</u> Entitled to Vote ..................................... 49

ii

PRINTED ON

RECYCLED PAPER

    4.    Who Can Vote in More Than One Class ............................................... 50
    5.    Votes Necessary to Confirm the Plan ................................................... 50
    6.    Votes Necessary for a Class to Accept the Plan ................................... 50
    7.    Treatment of Nonaccepting Classes ...................................................... 51
    8.    Request for Confirmation Despite Nonacceptance by
          Impaired Class(es) ................................................................................ 51

    B.    Liquidation Analysis ........................................................................................ 51

    C.    Feasibility ......................................................................................................... 55

V.    EFFECT OF CONFIRMATION OF PLAN ....................................................................... 57

    A.    Discharge .......................................................................................................... 57

    B.    Revesting of Property in the Reorganized Debtor ............................................ 58

    C.    Default ............................................................................................................... 58

    D.    Modification of Plan ......................................................................................... 59

    E.    Post-Confirmation Status Report ...................................................................... 59

    F.    Post Confirmation Conversion/Dismissal ......................................................... 59

    G.    Post Confirmation U.S. Trustee Fees ................................................................ 60

    H.    Final Decree ...................................................................................................... 61

DECLARATION OF GUY A. MASON ................................................................................... 62

PRINTED ON

RECYCLED PAPER

# **TABLE OF AUTHORITIES**

**Page(s)**

**STATUTES**

11 U.S.C. § 101 ....................................................................................................................2

11 U.S.C. § 362(d)(1) .................................................................................................19, 20

11 U.S.C. § 362(d)(2) .......................................................................................................20

11 U.S.C. § 362(d)(3) .................................................................................................18, 19

11 U.S.C. § 363(c)(2) .......................................................................................................19

11 U.S.C. § 501 ................................................................................................................57

11 U.S.C. § 502 ................................................................................................................57

11 U.S.C. § 502(a) ...........................................................................................................38

11 U.S.C. § 502(c) ...........................................................................................................38

11 U.S.C. § 502(g) ...........................................................................................................57

11 U.S.C. § 502(h) ...........................................................................................................57

11 U.S.C. § 502(i) ............................................................................................................57

11 U.S.C. § 507(a) ...........................................................................................................35

11 U.S.C. § 507(a)(1) .................................................................................................30, 49

11 U.S.C. § 507(a)(2) .......................................................................................................49

11 U.S.C. § 507(a)(3) .................................................................................................34, 35

11 U.S.C. § 507(a)(4) .................................................................................................34, 35

11 U.S.C. § 507(a)(5) .................................................................................................34, 35

11 U.S.C. § 507(a)(6) .................................................................................................34, 35

11 U.S.C. § 507(a)(7) ...........................................................................................34, 35, 49

11 U.S.C. § 507(a)(8) ...........................................................................................31, 32, 49

11 U.S.C. § 524 ................................................................................................................57

PRINTED ON

RECYCLED PAPER

11 U.S.C. § 546(b) .................................................................................................21, 22

11 U.S.C. § 1107(a) ......................................................................................................16

11 U.S.C. § 1108.............................................................................................................16

11 U.S.C. § 1112(b).........................................................................................................59

11 U.S.C. § 1121.............................................................................................................24

11 U.S.C. § 1127.............................................................................................................45

11 U.S.C. § 1129(a)(8)....................................................................................................51

11 U.S.C. § 1129(b).........................................................................................................51

11 U.S.C. § 1141.............................................................................................................57

28 U.S.C. § 1930(a)(6)....................................................................................................60

**Rules**

Bankruptcy Rule 1009 ...................................................................................................39

Bankruptcy Rule 3022 ...................................................................................................61

PRINTED ON

RECYCLED PAPER

# I.

## INTRODUCTION

Title Guarantee Building Owner, LLC, a Delaware limited liability company, is the debtor and debtor in possession (the "Debtor") in the above-captioned chapter 11 bankruptcy case (the "Case"). On February 23, 2009 (the "Petition Date"), the Debtor commenced the Case by filing a voluntary Chapter 11 petition under the United States Bankruptcy Code ("Bankruptcy Code"), 11 U.S.C. § 101 et seq. Chapter 11 allows the Debtor, creditors and others parties in interest to propose a plan of reorganization. A plan of reorganization may provide for the Debtor to reorganize by continuing to operate, liquidate by selling assets of the estate, or a combination of both. The Debtor is the party proposing the Debtor's Chapter 11 Plan of Reorganization (the "Plan") sent to you in the same envelope as this document. THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT ("Disclosure Statement") FOR THE PLAN.

The Plan is a plan of reorganization which has been proposed by the Debtor. The Effective Date of the Plan (the "Effective Date") will be the first business day which is at least eleven days following the date the Bankruptcy Court enters the order confirming the Plan (the "Plan Confirmation Order"), unless there is a stay in effect, in which case the Effective Date shall be the first business day after the stay is no longer in effect with respect to the Plan Confirmation Order. The Debtor, following the Effective Date, will be referred to herein as the "Reorganized Debtor."

## A. Purpose of This Document

This Disclosure Statement summarizes what is in the Plan, and tells you certain information relating to the Plan and the process the Court follows in determining whether or not to confirm the Plan.

PRINTED ON

RECYCLED PAPER

**<u>READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:</u>**

**(1)    WHO CAN VOTE OR OBJECT,**

**(2)    WHAT THE TREATMENT OF YOUR CLAIM IS (i.e., what your claim will receive if the Plan is confirmed), AND HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN LIQUIDATION,**

**(3)    THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY,**

**(4)    WHAT THINGS THE COURT WILL LOOK AT TO DECIDE WHETHER OR NOT TO CONFIRM THE PLAN,**

**(5)    WHAT IS THE EFFECT OF CONFIRMATION, AND**

**(6)    WHETHER THE PLAN IS FEASIBLE.**

This Disclosure Statement cannot tell you everything about your rights.  You should consider consulting your own lawyer to obtain more specific advice on how the Plan will affect you and what is the best course of action for you.

Be sure to read the Plan as well as this Disclosure Statement.  If there are any inconsistencies between the Plan and this Disclosure Statement, the Plan provisions will govern.

The Bankruptcy Code requires a Disclosure Statement to contain "adequate information" concerning the Plan.  The Bankruptcy Court ("Court") has approved this document as an adequate Disclosure Statement, containing enough information to enable parties affected by the Plan to make an informed judgment about the Plan.

PRINTED ON

RECYCLED PAPER

**B.      Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing**

THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT.  IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE.   HOWEVER, IF THE COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTOR AND ON ALL CREDITORS AND INTEREST HOLDERS IN THIS CASE.

**1.      Time and Place of the Confirmation Hearing**

The hearing where the Court will determine whether or not to confirm the Plan will take place on _____, 2009 at _____ _.m., in Courtroom 1668, located at 255 East Temple Street, Los Angeles, CA 90012.

**2.      Deadline For Voting For or Against the Plan**

If you are entitled to vote, it is in your best interest to timely vote by executing the enclosed ballot and returning the executed ballot in the enclosed envelope to:

> Levene, Neale, Bender, Rankin & Brill L.L.P.
> 10250 Constellation Blvd., Suite 1700
> Los Angeles, California 90067
> Telephone:    (310) 229-1234
> Facsimile:    (310) 229-1244
> Attention:  Monica Y. Kim, Esq.

Your ballot must be received by _____, 2009 or it will not be counted.

**3.      Deadline For Objecting to the Confirmation of the Plan**

Objections to the confirmation of the Plan must be filed with the Court and served upon counsel for the Debtor at the address listed in the upper left-hand corner of the first page of this Disclosure Statement by _____, 2009.

4

PRINTED ON

RECYCLED PAPER

### 4.    Identity of Person to Contact for More Information Regarding the Plan

Any interested party desiring further information about the Plan should contact Monica Y. Kim, Esq. of Levene, Neale, Bender, Rankin & Brill L.L.P., 10250 Constellation Blvd., Suite 1700, Los Angeles, California 90067, Telephone: (310) 229-1234.

### C.    Disclaimer

The financial data relied upon in formulating the Plan is based on the Debtor's books and records which, unless otherwise indicated, are unaudited.  The information contained in this Disclosure Statement is provided solely by the Debtor.  The Debtor represents that everything stated in this Disclosure Statement is true and correct to the Debtor's best knowledge.  The Court has not yet determined whether or not the Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Plan.

### II.

### BACKGROUND

### A.    What follows is a brief summary of the dates and circumstances that led the Debtor to file its bankruptcy.

### 1.    The Debtor's Business.

The Debtor is the fee owner of real property located at 411 West Fifth Street, Los Angeles, CA ("Property") which consists of 74 units of residential apartments.  The Property is a twelve-story building, exhibiting a "Zig-Zag Modern Art Deco" style tower, and is located at the intersection of 5th and Hill Streets in downtown Los Angeles, across the street from Pershing Square.  The Property offers valet parking for its residents and each unit is offered to residents with fully equipped and brand new kitchen appliances, including built-in refrigerators, stoves, and microwave ovens.  Although the apartment units are the primary component and character of

PRINTED ON
RECYCLED PAPER

the building, the Property also contains a small area which the Debtor may develop into retail space.

The Property was originally built in 1929-31 by the prominent architectural firm of John and Donald Parkinson, who, in addition to the Property, designed several other Los Angeles Historical-Cultural Monuments including the Los Angeles City Hall, Union Station and the Pacific Coast Stock Exchange buildings.  In 1984, the Los Angeles City Council declared the exterior of the Property a Historic-Cultural Monument.

From its original construction period, the Property was used primarily as commercial space, with The Title Guarantee Company utilizing the Property through approximately 1955. The Title Guarantee Company was important to the development of Los Angeles because of its role in real estate investment in the downtown core of Los Angeles, and it chose the Property for its administrative headquarters due to its prominent location on the perimeter of Pershing Square. In 1955, the Property was sold to Wells Fargo Bank, which occupied the building for business purposes.  In 1989, the building became largely occupied by La Opinion newspaper, which utilized the building as its headquarters until approximately 2004.  Between 2005 and 2008, the Property was rehabilitated for residential use and converted to luxury housing units.  Despite the conversion, much of the original exterior components of the Property were retained so as to ensure that the architectural importance and designation as a historic site remained and were preserved.

More specifically, the Property was renovated in conformance with the standards of "certified rehabilitation" of a "certified historic structure" as designated by the State Historic Preservation Official and the National Park Service.  Because the value of the renovations exceeded the acquisition basis, the rehabilitation project qualified for a 20% historic

6

rehabilitation investment tax credit established by the Internal Revenue Code of 1986 (the "Tax Credit" or "Tax Credits"). The conversion project commenced in approximately 2005, and was completed during the fourth quarter of 2007/beginning of 2008.

From the start of the conversion project through December 30, 2008, Swartz's partner, Brian Hudson ("Hudson"), held 85% interest in the Debtor, and an entity known as Title Guarantee Building Lessee, LLC ("Building Lessee") held the remaining 15% interest in the Debtor.[1] Building Lessee is, in turn, owned by Banc of America Historic Capital Assets LLC ("Tax Investor," as holder of 99.99%), Title Guarantee Building Manager, LLC ("Building Manager," as holder of .0001%), and FISERV Investor Support Services, Inc. FBO Daniel B. Swartz (as holder of .0099%). Swartz owned 100% of Building Manager. Under this structure, the Tax Investor was allocated 99.99% of the profits/losses of the Building Lessee and 99.99% of the Tax Credits.

To take advantage of the Tax Credits, Swartz entered into a historic tax credit transaction with the Tax Investor. Under this transaction and pursuant to a Master Lease Agreement, the Debtor master leases the Property and transfers the Tax Credits to Building Lessee, which is responsible for the day-to-day operations of the building, including leasing the units to renters. Under the Master Lease Agreement, Building Lessee is required to pay "Rent" to the Debtor,

---

[1]  As described further below, pursuant to the First Amendment to the Operating Agreement of Building Lessee, Building Lessee was required to made certain contributions to the Debtor (from funds that it receives from the Tax Investor) in consideration for its 15% interest in the Debtor. As of the Petition Date, a balance of $1,712,535 of the required contribution had not been made and remained outstanding. Under the Plan, Tax Investor will provide to Building Lessee the funds necessary for Building Lessee to pay the remaining required contribution to the Debtor to retain its 15% interest in the Debtor.

PRINTED ON

RECYCLED PAPER

which is essentially calculated to equal the sum necessary to enable the Debtor to meet all debt service obligations and any costs of building ownership. The "Rent" may be adjusted on an annual basis or in the event of refinancing. The Debtor may also terminate the Master Lease Agreement in the event of default (e.g., non-payment of "Rent").

The Tax Investor agreed to make capital contributions to the Building Lessee in an amount equal to 98% of the Tax Credits (which equated to approximately $4.2 million based on the construction budget). The Debtor believes that the capital contributions agreed to be made by Tax Investor to the Building Lessee is required in order for the Tax Investor to obtain 99.99% of the Tax Credits and its 99.99% interest in Building Lessee. Although the Tax Investor earns the Tax Credits on the date the Property is placed in service, it becomes vested in the Tax Credits at the rate of 20% per full year. Accordingly, the Tax Investor must maintain its investment in the Building Lessee for a minimum of 5 years or the Tax Credits will be recaptured on a prorated basis by the Internal Revenue Service (with no proration for partial years). In other words, the Tax Investor will be liable for past taxes avoided as a result of the Tax Credit plus interest and possibly penalties. For example, if the Master Lease Agreement is terminated during the second year, the Tax Investor will only be 20% vested and, thereby, could owe over $3.5 million in taxes plus interest to the Internal Revenue Service. In this case, the Tax Credit recapture period expires in February 2014.

As of the Petition Date, "Rent" in excess of $1.6 million was unpaid by Building Lessee under the Master Lease Agreement, and no post-petition "Rent" has been paid by Building Lessee or the Tax Investor to the Debtor. As of August 31, 2009, "Rent" of approximately $2.2 million is outstanding. As a result of these defaults, the Debtor has the right to terminate the Master Lease Agreement; however, the Debtor has not elected to do so. The main reason for the

PRINTED ON
RECYCLED PAPER

Debtor not having terminated the Master Lease Agreement is to preserve and obtain the balance of the contributions to Building Lessee as described herein. Once Building Lessee receives these contributions from Tax Investor, and the Debtor, in turn, receives these contributions from Building Lessee, the Debtor will waive the "Rent" receivable.

More specifically, pursuant to the First Amendment to the Operating Agreement of Building Lessee dated July 17, 2007 ("Building Lessee Operating Agreement"), the Debtor contends that Tax Investor is required to invest and contribute certain amounts of money to Building Lessee (estimated to be approximately $4.2 million) in order to maintain and benefit from the Tax Credit. As of the Petition Date, a balance of $1,712,535 remained to be contributed by Tax Investor to Building Lessee (the "Capital Contribution"), which, in turn, must be contributed to the Debtor. Under the Plan, Tax Investor will make the Capital Contribution of $1,712,535 to Building Lessee upon confirmation of the Plan and execution of amended agreements relating to the Tax Credits reflecting changes that are necessary to conform the terms of such agreements to the terms of this Plan (collectively, the "Amended Tax Credit Agreements") and containing such other terms as the Tax Investor may reasonably request, including, without limitation:

    1)    an amended Master Lease Agreement which shall provide for the following:

        a.  the "Rent" due under the amended Master Lease Agreement shall be equal the cash flow of the Property for the period from the Effective Date of the Plan through the expiration of the recapture period in February 2014; and

        b.  the Debtor, as landlord under the amended Master Lease Agreement, shall not have any rights to terminate the amended Master Lease Agreement for

PRINTED ON
RECYCLED PAPER

failure to pay "Rent" when due during the Tax Credit recapture period, which expires in February 2014; and

2)      an amended Operating Agreement relating to Debtor; and

3)      an amended Operating Agreement relating to Building Lessee; and

4)      an agreement to be executed by Capri Select Income II and Title Guarantee Acquisition, LLC reaffirming the existing guarantees relating to the Tax Credits or the Property, in form and substance acceptable to Tax Investor, Capri Select Income II and Title Guarantee Acquisition, LLC; and

5)      an agreement executed by Title Guarantee Acquisition, LLC and Capri re-affirming the Option Agreement; and

6)      such other agreements re-affirming existing obligations as may reasonably be requested by Tax Investor.

The terms of the agreements described above shall be agreed upon prior to confirmation and shall be executed prior to the Effective Date.

The $1,712,535 contribution by Tax Investor to Building Lessee is required to be paid to the Debtor as part of Building Lessee's equity contribution for its 15% interest in the Debtor. Under the Amended Tax Credit Agreements, the Debtor will first need to use approximately $331,562 of the Capital Contribution to pay: (a) attorneys' fees and expenses incurred by Tax Investor which are estimated to be approximately $300,000 as of the Effective Date of the Plan, and (b) approximately $31,562 in unpaid asset management fees that will be due for the period through December 31, 2009.  The balance of Capital Contribution remaining after the payment of these expenses will be approximately $1.3 million and will be referred to herein as the "Net Capital Contribution."

10

In addition to the Capital Contribution of $1,712,535, the Debtor believes that Tax Investor will contribute approximately $400,000 to Building Lessee (the "Supplemental Capital Contribution") upon confirmation of the Plan and upon receipt by the Tax Investor of a certification issued by an accountant satisfactory to the Tax Investor that the remaining Tax Credits are available based on the final construction costs of the project.  Building Lessee and the Debtor have been diligent in their efforts to obtain such certification, and have every confidence and indication that the necessary certificate will be obtained.  As a result, the estate will receive, upon confirmation, an additional sum of approximately $400,000 from Building Lessee.  The Debtor intends to utilize these funds to fund the payments required to be made to Bank of America, N.A. under the Plan, and for working capital purposes (such as roof repairs, retail and amenity related improvements and leasing and related marketing campaigns and programs.).

As of December 31, 2008, 24 of the 74 units were leased, for an occupancy rate of approximately 38.8%.  Periodically, the Property has also been used for shooting commercials, videos and other media programs.  Pursuant to an appraisal report issued by Cushman & Wakefield ("Cushman"), the "as is" market value of the Property, as of December 31, 2008, was $23,700,000.  The Cushman appraisal further opines that once the Property is stabilized, the Property would have a market value of $26,000,000.  A copy of the Cushman appraisal is attached hereto as Exhibit "1".  If the Bank does not consent to the treatment of its "Bank's Secured Claim" (as defined below) or an agreement is not reached between the Debtor and the Bank regarding the treatment of the Bank's Secured Claim, the Debtor will obtain a further appraisal of the Property which may be needed in connection with confirmation of this Plan.

///

PRINTED ON

RECYCLED PAPER

### 2.    The Bank of America Senior Loans and Mezzanine Junior Loans.

In 2005, the Debtor (through Swartz) obtained loans from Bank of America, N.A. (the "Bank") that were needed to achieve the rehabilitation, construction and development of the Property.  The loans were secured by a first priority deed of trust against the Property, recorded with the Los Angeles County Recorders Office on October 14, 2005.

At around the same time, and in addition to the secured loans from the Bank, the Debtor obtained a mezzanine loan from Capri Select Income II ("Capri"), which was secured by, among other things, a deed of trust against the Property subordinate to the lien of the Bank, Hudson's 85% interest in the Debtor, and Swartz's 100% interest in Building Manager.  Like the Bank loans, the proceeds of the mezzanine financing were used by the Debtor for the rehabilitation, construction and development of the Property.  The original amount of the mezzanine loan to the Debtor was $5.8 million, and the loan was subsequently increased to $7.55 million in July 2007.

Pre-petition, the Debtor defaulted on its obligations to the Bank and Capri.  In July 2008, the Bank sent a notice of default letter notifying the Debtor of the alleged defaults under its loan agreement with the Bank, and demanding full and immediate payment of the amounts due thereunder.  When the demands were not met, the Bank attempted to foreclose upon the Property, with a foreclosure sale originally scheduled for December 1, 2008.  Contemporaneously with the Bank's efforts to exercise its rights and remedies against the Debtor and the Property, Capri was also exercising its rights and remedies vis a vis certain of its collateral, namely, the interests in the Debtor and Building Manager held by Hudson and Swartz, respectively.  Given these events, the Bank and Capri engaged in discussions with regard to a possible restructure of the Debtor's loan obligations to the Bank, and as part of these discussions, the Bank agreed to postpone the foreclosure sale from December 1, 2008 to February 24, 2009.

PRINTED ON

RECYCLED PAPER

On December 30, 2008, and through its wholly-owned subsidiary known as Title Guarantee Acquisition, LLC ("Title Acquisition"), Capri successfully foreclosed upon Hudson's 85% interest in the Debtor, and Swartz's 100% interest in Building Manager.  As a result of the foreclosure pursuant to applicable provisions of the Uniform Commercial Code, Title Acquisition became the controlling equity holder of the Debtor.

Unfortunately, by February 23, 2009, the Bank and Capri had not yet reached terms with regard to a restructure of the Bank's loans to the Debtor, and the Bank was not willing to further postpone the foreclosure sale of the Property.  As a result, the Debtor commenced this Chapter 11 case on an extreme emergency basis on February 23, 2009 to prevent a foreclosure of the Property by the Bank.

As a result of the aforementioned foreclosure by Title Acquisition, effective as of December 31, 2008, the Debtor became owned 85% by Title Acquisition (which is, in turn, owned 100% by Capri and which is now the Debtor's managing member), and Building Lessee continues to hold the remaining 15% interest in the Debtor.  As described more fully below in Paragraph 3, contemporaneously with Title Acquisition's foreclosure efforts, Swartz (for himself and on behalf of the Debtor) filed a complaint against Capri in the California Superior Court, Los Angeles County (the "State Court Action") alleging, among other things, that Capri was not a licensed lender in the State of California and that the interest charged by Capri under the mezzanine loans were usurious (collectively, the "Usury Claims").  Swartz also filed ex parte papers seeking a temporary restraining order to enjoin Title Acquisition from proceeding with the foreclosure of his and Hudson's interests in Building Manager and the Debtor, respectively. However, the state court denied the ex parte request, and Title Acquisition proceeded to conclude

PRINTED ON

RECYCLED PAPER

its foreclosure of such interests.    After the foreclosure, the Debtor (with Title Acquisition controlling the majority interests) dismissed the Usury Claims against Capri.

As of the Petition Date, the Bank claims that it was owed the aggregate sum of $24,830,804.86, which breaks down into $22,889,916.94 of principal, $1,752,747.41 of interest, and $188,140.51 of attorneys' fees and cost.  By May 8, 2009, the Bank asserts that its claim increased to $25,203,012.64, which breaks down into $22,889,916.94 of principal, $2,093,870.76 of interest, and $219,224.94 of attorneys' fees and costs.  These figures are derived from the Stay Motion (as defined below) filed by the Bank in the case.  On August 10, 2009, the Bank filed a proof of claim asserting a claim of $24,830,804.86 as of the Petition Date; however, the proof of claim does not provide a loan balance statement or any other detailed itemization and back-up of the alleged claim.  The Debtor reserves all of its rights to object to the Bank's claim.

As of the Petition Date, Title Acquisition (as the assignee to Capri of the mezzanine loans made to the Debtor) was owed the aggregate sum of $10,975.173.78.  Under the Plan, and even if the market value of the Property is determined at confirmation to be higher than the allowed secured claim of the Bank, Title Acquisition has agreed to have the full amount of its claim treated as a general unsecured claim under the Plan (i.e., Class 4), subordinate to all non-insider general unsecured claims.  Title Acquisition will not receive any payment on account of its claim under the Plan.

**3.    State Court Litigation with Daniel Swartz and Related Individuals and Entities.**

As a result of the foreclosure, all rights of Swartz to manage or control the Debtor, the Property, Building Manager and Building Lessee were terminated.    However, despite the

14

foreclosure, Swartz continued to interfere with the management and control of the Debtor, the Property, Building Manager and Building Lessee.  For example, Swartz continued to collect rents from the residents and the Debtor alleges that he did not remit such rents to the Debtor. Swartz also continued misrepresenting to third parties that he was the person in control of the Debtor.  As a result, the Debtor, together with Building Lessee and Building Manager, asserted counter-claims against Swartz, Hudson and related entities (collectively, the "Swartz Parties") in the State Court Action alleging, among other things, tortious interference.  The Debtor also filed ex parte papers seeking a temporary restraining order to enjoin the Swartz Parties from continuing to improperly interfere with the management and control of the Debtor and the Property.  However, this Chapter 11 case was filed prior to the hearing scheduled on the temporary restraining order, and, as a result, the Debtor never obtained such an order in the State Court Action.

Additionally, despite the foreclosure, Swartz did not turn over to Title Acquisition all of the Debtor's books and records and other information and data necessary for the Debtor to administer, and address the compliance requirements of, this case, including those relating to the construction, loans or other business transactions between the Debtor and its vendors and other creditors.  Therefore, Title Acquisition does not currently have in its possession a complete set of the Debtor's books, records, information or other data pertaining to the Debtor or the Property. While Title Acquisition has been able to retrieve some information and data relating to the Debtor and the Property from every source possible, including third party sources, it is unknown whether such information and data are accurate, and, more importantly, whether such information and data are complete as it appears that Swartz may have improperly diverted funds and other assets which otherwise belong to the Debtor but were not properly reflected on any

PRINTED ON

RECYCLED PAPER

official record kept by or for the Debtor.  The current owners of the Debtor have attempted to respond timely to all compliance requirements of this case to the best of their ability and based on all current information and documents known and available to them.

Following the commencement of its case, the Debtor has continued to operate its businesses and manage its affairs as debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Debtor's chapter 11 case.

**B.    Events Occurring After Bankruptcy Filing.**

The following is a summary of the material events occurring after the bankruptcy filing of the Debtor:

**1.    Bankruptcy Court Litigation with Daniel Swartz and Related Individuals and Entities.**

Shortly after filing Chapter 11, the Debtor filed a complaint against the Swartz Defendants in the Court (the "Adversary Proceeding") for, among other things, tortious interference, violation of the automatic stay resulting from the Swartz Parties' continuing interference and control over the Debtor, the Property and other property of the estate, and for turnover of property of the estate, including cash, books and records.  Together with the complaint, the Debtor sought an emergency hearing before the Bankruptcy Court for a temporary restraining order to enjoin the Swartz Defendants from continuing to improperly interfere and control the Debtor, and its assets.  While the Court did not issue the temporary restraining order, the Court required Swartz to take an oath and speak with the Court on the issues surrounding his purported interference with and control of the Debtor and the Property.  During this hearing, Swartz testified, under oath, that he was not and would not interfere with the Debtor, the

PRINTED ON
RECYCLED PAPER

Property or other assets of this estate; however, in the Debtor's view, Swartz has not lived up to his representations to the Court.  For example, Swartz has not delivered a shred of documents or information to the Debtor that relates to the Debtor or the Property prior to the December 30, 2008 foreclosure.  Additionally, he has prevented the Debtor and others from the Property's websites (www.titleguaranteebuilding.com; www.tbglofts.com) by implementing a passcode requirement in order to access the information on these websites.  Swartz has also diverted post-petition rents from the Property.  The Debtor reserves all rights and claims against Swartz, including the seeking of sanctions for his dishonesty with the Court.

Although Swartz occupies one of the biggest units within the Property (and the only unit with a pool), he has not paid any rents.  Therefore, Building Lessee has commenced an unlawful detainer action against Swartz, which is ongoing.

The Swartz Defendants have also filed cross-claims in the Adversary Proceeding against Capri, re-asserting the Usury Claims.

Given that the State Court Action and the Adversary Proceeding essentially involve the same facts, claims and parties, the Debtor and the Swartz Defendants are discussing a mutually acceptable consolidation of the matters, to avoid the parties having to litigate in two separate forums.  The Debtor has agreed, subject to Court approval, to dismiss the Adversary Proceeding and litigate all claims and disputes within the State Court Action.  While settlement discussions have occurred, no settlement has been reached.

**2.    Employment of Professionals.**

On April 24, 2009, the Court entered an order authorizing the Debtor to employ the law firm of Levene, Neale, Bender, Rankin & Brill L.L.P. ("LNBRB"), effective as of the Petition Date, as its general insolvency counsel to assist in the administration of the Case and

17

reorganization of its business affairs.  Swartz objected to the proposed employment of LNBRB as the Debtor's bankruptcy counsel on the grounds that (i) there had not been adequate disclosure of the source of the retainer received by LNBRB, and (ii) LNBRB was conflicted with respect to carrying out its duties and obligations to the Debtor because the ultimate source of the retainer paid to LNBRB was Capri.  Following briefing by both sides and a hearing, the Court overruled these objections, and authorized the employment of LNBRB as bankruptcy counsel to the Debtor.

In addition, on May 11, 2009, the Court entered an order authorizing the Debtor to employ the law firm of Greenberg Traurig ("GT"), effective as of the Petition Date, to serve as special counsel to the Debtor.  GT will handle (i) all matters relating to the pending State Court Action, (ii) handling the filing and prosecution of all other lawsuits which the Debtor determines are appropriate or necessary to preserve, and maximize the value of, the assets of this estate, but which are not adverse to Building Lessee, and (iii) handling of all matters that are unrelated to bankruptcy law, such as corporate, tax, securities, or real estate matters on behalf of the Debtor.

The Debtor may also be filing an application to employ a real estate appraiser and accountants in the near future.  The Debtor does not contemplate the hiring of any additional professionals other the ones identified herein.

**3.      Motions Filed by the Bank for Determination of Debtor's Case as "Single Asset Real Estate" Case and for Relief From the Automatic Stay.**

Shortly after the Petition Date, the Bank filed a motion with the Bankruptcy Court seeking a determination that the Debtor's Case should be designated and treated as a "single asset real estate" case, subject to, among others, Section 362(d)(3) of the Bankruptcy Code.  The Debtor filed its notice of non-opposition to this motion, and the Court entered an order granting

PRINTED ON

RECYCLED PAPER

the motion, and finding that this Case is a "single asset real estate" case under the Bankruptcy Code.  As a "single asset real estate" debtor, the Debtor is subject to the provisions of Section 362(d)(3) of the Bankruptcy Code which provides the Court, on request of a party in interest and after notice and a hearing, to grant relief from the stay in favor of a creditor whose claim is secured by an interest in the property unless, by not later than 90 days after the filing date or 30 days after the court determines that the debtor is subject to Section 362(d)(3), whichever is later, the debtor (1) has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time, or (2) commenced making monthly payments that (a) may, in the debtor's discretion, notwithstanding Section 363(c)(2), be made from rents or other income generated before, on, or after the date of the commencement of the case by or from the property to each creditor whose claim is secured by such real estate (other than a claim secured by a judgment lien or by an unmatured statutory lien), and (b) are in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate.

The first business day following the 90th day of the Petition Date was May 26, 2009.  The Debtor filed its Plan, which it strongly believes can be confirmed within a reasonable time, together with this Disclosure Statement, on May 26, 2009.  Coincidentally, the Court had issued an order requiring that the Debtor file its plan of reorganization and related disclosure statement by May 26, 2009.  By having filed its Plan and this Disclosure Statement on May 26, 2009, the Debtor has complied with both the Court's order, and the provisions of Section 362(d)(3) of the Bankruptcy Code.

On May 15, 2009, the Bank filed its motion for relief from the automatic stay (the "Stay Motion") seeking relief from the automatic stay pursuant to 11 U.S.C. §§ 362(d)(1) and

19

362(d)(2).  The Bank argued, pursuant to Section 362(d)(1) of the Bankruptcy Code, that "cause"

exists for granting relief from the automatic stay because its interest in the Property is not

adequately protected by an adequate equity cushion.  The Bank further argued, pursuant to

Section 362(d)(2) of the Bankruptcy Code, that the Debtor has no equity in the Property and that

the Property is not necessary for an effective reorganization.  Because the value of the Property

is not declining, but rather, increasing – as evidenced by the Bank's appraisal of the Property

conducted in October 2008[2] - the Bank remains adequately protected, and the Debtor strongly

believes that the Bank's arguments on Section 362(d)(1) of the Bankruptcy Code fail.

Additionally, the Debtor simply could not reorganize without the Property, and, therefore, the

Bank's arguments on Section 362(d)(2) of the Bankruptcy Code must also fail.

The Debtor has objected to the Stay Motion.  The original hearing set on the Stay Motion

was June 10, 2009 at 10:00 A.M.  However, for a variety of reasons, the hearing on the Stay

Motion has been continued on several occasions.  Currently, the hearing on the Stay Motion is

scheduled for October 27, 2009 at 10:00 A.M.

### 4.    Actions Taken by Certain Mechanics Lienholders.

Turelk, Inc. ("Turelk") served as the general contractor in the rehabilitation, construction,

renovation, and development of the Property.  The Debtor is informed and believes that a variety

of disputes arose between Swartz, Turelk and a large number of subcontractors during the

---

[2]  The Bank obtained an appraisal of the Property from CB Richard Ellis in October 2008.  According to
this appraisal, as of October 24, 2008 (four months prior to the Petition Date), the Property's value was
$20,600,000 (without Mills Act) and $22,400,000 (with Mills Act). CB Richard Ellis goes on to note that,
upon stabilization of the Property which it estimated would occur around May 1, 2009, the Property's value
would increase to $23,200,000 (with Mills Act) and $21,400,000 (without Mills Act).  Under the Mills Act,
a city or a county may contract with the owner of qualified historical property to restructure the use of the
property in such a way as to promote the property's continued preservation.  In exchange for agreeing to
the restriction on use, the property owner receives a preferential tax assessment.  The Debtor's Property is
not currently subject to, but eligible for, Mills Act treatment.  The Cushman valuation is on an "as is" basis
without Mills Act treatment.  See page 66 of the Cushman appraisal report attached hereto as Exhibit "1."

PRINTED ON

RECYCLED PAPER

conversion project, which resulted in the recording of the following mechanic's liens against the

Property on or before the Petition Date:

| Name of Filer | Amount Claimed ($) | Date of recordation | Complaint filed? Within 90 days of Petition Date? |
|---|---|---|---|
| Thyssenkrupp Elevator | 26,255 | 9/28/07 | Yes, filed 12/28/07 (within 90 days) |
| Thyssenkrupp Elevator | 41,200.84 | 10/22/07 | Yes, filed 12/28/07 (within 90 day) |
| Superior Wall Systems | 411,589 | 2/26/08 | No |
| Tristate dba Journey Elec. | 139,761.26 | 2/26/08 | Yes, filed 5/23/08 (within 90 days) |
| Ultimate Renewal | 67,107.50 | 2/26/08 | No |
| Basec Structures | 29,011 | 3/13/08 | Yes, filed 9/23/08 (beyond 90 days) |
| All Trades Fabrication | 69,594.90 | 3/26/08 | No |
| Empire Electrical Supply | 10,874.68 | 3/31/08 | No |
| Brand Energy | 1,487.40 | 6/30/08 | No |
| Howard Roofing | 28,326.80 | 7/2/08 | No |
| Ronit Yemini dba Coastal Tile | 18,236.20 | 7/8/08 | Yes, filed 2/2/09 (beyond 90 days) |
| All Trades Fabrication | 82,546.90 | 7/10/08 | No |
| Basec Structures | 87,500 | 7/10/08 | Yes, filed 9/23/08 |
| Muir-Chase Plumbing Co., Inc. | 164,096.98 | 2/9/09 | No |

Under California law, a foreclosure suit (an enforcement action) must be commenced on

a mechanic's lien within 90 days of recording to maintain the perfection of a lien or the lien is

null and void.    Section 546(b) of the Bankruptcy Code unambiguously mandates that, if

PRINTED ON

RECYCLED PAPER

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

commencement of an action is required to maintain or continue perfection, notice shall be given instead.

Post-petition, an entity known as Kitson Specialty Contracting, Inc. ("KSC") recorded its Claim of Mechanic's Lien and filed its foreclosure suit. KSC also filed a notice in the Case indicating that it has a perfected mechanic's lien against the Property as a result of the foregoing. The Debtor disputes KSC's position, and contends that the post-petition recording of its Claim of Mechanic's Lien and the filing of its foreclosure suit are both actions in violation of the automatic stay provisions of the Bankruptcy Code. Accordingly, the Debtor has filed its notice indicating its objection to the position taken by KSC that it has any perfected mechanic's lien against the Property.

Additionally, on May 7, 2009, Muir Chase Plumbing Co., Inc. ("Muir") filed its "Notice of Continued Perfection of Lien" with respect to its Claim of Mechanic's Lien recorded on February 9, 2009. Muir had recorded its Claim of Mechanic's Lien prior to the Petition Date, and the Notice of Continued Perfection of Lien, filed pursuant to Section 546(b) of the Bankruptcy Code, was filed within 90 days of the recording date.

However, whether or not any holder of a mechanic's lien filed a foreclosure suit (or notice pursuant to Section 546(b) of the Bankruptcy Code) timely to continue perfection of its lien, the market value of the Property at confirmation does not even support the two claims of the Bank and Title Acquisition, which are secured by deeds of trust recorded with the Los Angeles County Recorders Office prior to any of the recorded Claims of Mechanic's Lien. As a result, all claims asserted by holders of mechanic's liens constitute general unsecured claims in this case, and, therefore, have been placed in Class 3 (class of general unsecured claims) under the Plan.

/ / /

PRINTED ON
RECYCLED PAPER

## 5.    Leasing Activities of the Property.

Since the foreclosure, members of Capri, which is the sole member of Title Acquisition (the 85% interest holder of the Debtor), have been involved on a daily basis with the Debtor, the Property and matters pertaining to the Debtor and the Property, in an effort to preserve the maximum value of the Property for this estate.  For example, from January 1, 2009 through the current period, number of leased units at the Property has increased from 31 units to 68 units due to the efforts of the current owners.  Moreover, the Debtor has spent, and continues to spend, an enormous amount of time, energy and resources attempting to stop Swartz from continuing to take improper and harmful behavior which impairs property of this estate.

The Debtor also:

- Has ensured that the Property is managed on a day-to-day basis by a competent third party and on-site property management company which communicates with the Debtor on an almost daily basis.

- Is continuing to monitor and adopt aggressive leasing strategies which are warranted by the current market conditions and are consistent with competitive properties, including rent concessions and competitive pricing of rents, with respect to its 16 open units.

- Is considering ways to increase amenity offerings at the Property to attract more renters.

- Has ensured that all operating expenses related to the Property are funded despite any rental shortfalls.

Based on the Debtor's development and implementation of very aggressive leasing strategies, the Debtor believes that full occupancy at the Property will be achieved in the near

PRINTED ON

RECYCLED PAPER

future, possibly by confirmation of the Plan.  This likely will result in a further increase in the value of the Property.

      **6.**       **Motion for Extension of Debtor's Exclusive Period to Obtain Acceptances of its Plan.**

On or about August 6, 2009, the Debtor filed its motion for an extension of its exclusive period to obtain acceptances of its Plan.  The Debtor filed its Plan on May 26, 2009, before the expiration of its 120 day exclusive period to file a plan of reorganization.  Pursuant to Section 1121 of the Bankruptcy Code, without any extension, the Debtor's exclusive period to obtain acceptances of its Plan would have expired on August 24, 2009 (i.e., 180 days from the Petition Date).

Since June 2009, the Bank indicated that it wished to discuss the terms of the Plan with the Debtor.  During the middle part of June 2009, an in-person meeting was scheduled to discuss the Plan; however, the Bank cancelled the meeting with the Debtor the day before the parties were scheduled to meet.  In late-June, 2009, the parties conducted an all-hands conference call, and at the conclusion of the call, the Bank indicated that it would provide a proposal and/or feedback to the Debtor regarding the parameters of a consensual plan of reorganization.  After months of silence, around August 11, 2009, the Debtor was finally notified that the Bank would not vote for the Plan.

Waiting for the Bank's response to the Plan has delayed the confirmation process; as a result, the Debtor has filed its motion seeking a 120 day extension of its exclusive period to obtain acceptances of its Plan to and including December 23, 2009, without prejudice to the Debtor's right to seek further extensions of such period.  The Court has granted this motion

PRINTED ON
RECYCLED PAPER

extending the Debtor's exclusive period to obtain acceptances of its Plan to and including December 23, 2009.

**C.      Summary of Debtor's Plan.**

1.      The Effective Date of the Plan will be the first business day which is at least eleven days following the date the Bankruptcy Court enters the order confirming the Plan (the "Plan Confirmation Order"), unless there is a stay in effect, in which case the Effective Date shall be the first business day after the stay is no longer in effect with respect to the Plan Confirmation Order.  The Debtor, following the Effective Date, will be referred to herein as the "Reorganized Debtor."

2.      The Plan will be funded from:  (a) Net Capital Contribution of approximately $1.3 million as described in Article II, Section 1(A) above; (b) the Supplemental Capital Contribution of approximately $400,000 as described in Article II, Section 1(A) above (of which $150,000 shall be the "new value" contribution by Building Lessee for maintaining its 15% interest in the Reorganized Debtor); (c) contributions from Title Acquisition as described in Paragraph 9 below, and (d) cash flow obtained from the Property.

3.      Based on competent evidence obtained by the Debtor to date (i.e., the December 31, 2008 appraisal by Cushman) and the Debtor's projections and assumptions which are described further below and in Exhibits "2" and "3" attached hereto, the Debtor's current belief is that the market value of the Property at confirmation will be approximately $24,759,000. More specifically, Cushman indicates that the market value of the Property, as of December 31, 2008, was $23,700,000.  Exhibit "2" attached hereto identifies the assumptions used by Cushman in its December 31, 2008 appraisal report.  Utilizing these same assumptions, except for the start date of the discounted cash flow, the Debtor believes that the market value of the Property as of

PRINTED ON
RECYCLED PAPER

Plan filing date is $23,818,000 for the apartment component of the Property, and $941,000 for the retail component of the Property, for a combined total value of $24,759,000.  See Exhibit "3" attached hereto.

4.    Under the Plan, Class 1 consists of the allowed secured claim of the Bank.  On the Effective Date, the Bank shall have an allowed secured claim equal to the market value of the Property (the "Bank's Secured Claim").  The Bank's Secured Claim shall accrue interest at the rate of LIBOR plus 200 basis points from the Effective Date.  The Bank's Secured Claim shall not be amortized, and the Reorganized Debtor shall make monthly interest only payments, with the first payment due on the first business day of the second full month following the Effective Date (with such payment to cover the period from the Effective Date to the end of the first full month)[3], and all subsequent payments due on the fist business day of the month for interest accrued during the prior month).  The Bank's Secured Claim shall mature on the 5th anniversary date following the Effective Date.  Capri shall guarantee payment of all interest payable with respect to the Bank's Secured Claim, with such guarantee to be in the form attached as Exhibit "4" attached hereto.  Capri shall also provide a non-recourse guarantee in the form attached as Exhibit "5" attached hereto for the usual and customary exceptions, such as losses or damages suffered by the Bank with respect to any fraud, misrepresentations or reckless damage to the Property by the Reorganized Debtor, failure to pay taxes or assessments to the extent funds generated by the Property have been misapplied by the Reorganized Debtor, or misapplication of insurance or condemnation proceeds, security deposits or rents by the Reorganized Debtor.  The Reorganized Debtor shall have the right to prepay the Bank's Secured Claim at any time without penalty or fees.  Pending satisfaction in full of the Bank's Secured Claim and all accrued, unpaid

---

[3]  By way of example, if Effective Date is December 15, 2009, the first interest payment will be made on February 1, 2010 and cover the interest accrued during the period from December 15, 2009 to January 31, 2010.

PRINTED ON

RECYCLED PAPER

interest, the Bank shall retain its first priority deed of trust upon the Property.  In addition, the

"*Agreement to Rescind Subordination of Master Lease between Bank of America, N.A. and Banc*

*of America Historic Capital Assets LLC*" shall remain in place.

5.    Attached hereto as <u>Exhibit "6"</u> is a monthly cash flow projection of the Property

over the next 7 years, starting June 2009.  As set forth in these cash flows, assuming the Bank's

Senior Claim at $24,759,000, and assuming that the Effective Date occurs on December 1, 2009,

the Reorganized Debtor will experience shortfalls (<u>i.e.</u>, negative cash flow after debt service

payments to the Bank) every month from December 1, 2009 to March 31, 2010 totaling

$580,524.  Under the Plan, Title Acquisition will contribute the funds necessary to address any

shortfalls so as to avoid default by the Reorganized Debtor of its payment obligations to the

Bank under the Plan.  Title Acquisition is wholly owned by Capri, which is a financially sound

fund managed by Capri Capital Partners ("Capri Capital").  Capri is a private real estate

investment company formed in 2004 to acquire, originate and manage a portfolio of commercial

real estate and real estate-related assets.  Capri was originally capitalized with $312.5 million in

contributed capital from institutional investors.  The investors include primarily pension funds,

which provide retirement income for elderly, hard working, retired public employees, such as

teachers, police and firemen, but do not include investment vehicles such as hedge funds or

"fund of funds" type structures.  As of March 31, 2009, Capri reported on its unaudited

Consolidated Balance Sheet total assets of approximately $542.9 million and net assets (less

liabilities) of approximately $166.5 million.  The manager of Capri is Capri Capital, a privately

held, SEC-registered real estate investment advisory firm headquartered in Chicago, Illinois.

Capri Capital (and/or its predecessor entities) date back to 1992.  Capri Capital is an experienced

investor in commercial real estate equity and debt markets and represents some of the largest

PRINTED ON

RECYCLED PAPER

pension funds and other institutional investors in the United States. As of March 31, 2009, Capri Capital had approximately $4.2 billion in real estate assets under management, diversified by geography and product type (with a high concentration and focus in the multi-family residential product). Therefore, there is no doubt that Title Acquisition will have sufficient financial wherewithal to make the necessary payments under the Plan.

6. Under the Plan, Class 2 shall consist of the claim of the Los Angeles County Tax Collector ("LA County") for the sum of $167,063.70. This claim arises from the second installment of 2008-2009 property taxes attributable to the Property which were not paid. The amount of the bill was $151,867. Consistent with the bill, the Los Angeles County Tax Collector has filed a secured claim for the sum of $151,867. As a penalty, the Debtor is required to pay 10% of the installment, plus a $10.00 fee. The Reorganized Debtor shall pay an amount equal to one-half of the allowed claim on the Effective Date of the Plan from the Net Capital Contributions and Title Acquisition shall pay the remaining one-half of the allowed claim by the third month of the Effective Date of the Plan.

7. Under the Plan, Class 3 shall consist of all general unsecured claims, excluding the claims of insiders (namely, the over $10 million claim held by Title Acquisition), but including any deficiency claim of the Bank, the claims of holders of mechanic's liens, and all other general unsecured creditors. On the Effective Date, Class 3 creditors shall receive, on a pro rata basis, $1 million from the Reorganized Debtor from the Net Capital Contribution.

8. Under the Plan, Class 4 shall consist of the subordinated insider claim of Title Acquisition. Under the Plan, Title Acquisition shall receive no payment on account of its claim.

9. Under the Plan, Class 5 shall consist of the equity interests in the Debtor, which shall remain unchanged from the pre-bankruptcy structure (i.e., Building Lessee to retain 15%

PRINTED ON
RECYCLED PAPER

interest in the Debtor and Title Acquisition to retain 85% interest in the Debtor).  Building Lessee shall retain its 15% interest in the Debtor in exchange for a "new value" contribution of approximately $150,000 from the Supplemental Capital Contribution.  Title Acquisition shall retain its 85% interest in the Debtor in exchange for all post-petition contributions that it has already made to the Debtor, and all post-confirmation contributions that it will make to the Reorganized Debtor, all as described as follows (collectively, the "Title Acquisition Contributions"):

- Post-petition contribution of $25,000 to enable the Debtor and Building Lessee to fund operating expense shortfalls.

- Post-petition contribution of approximately $33,534.09 to enable the Debtor to renew insurance on the Property.

- Payment of all allowed fees and expenses of professionals employed by the Debtor's estate, which are estimated to be approximately $200,000.

- Payment of one-half of the allowed secured claim of LA County, which is estimated to be approximately $85,000.

- Post-confirmation interest payments to the Bank on the Bank's Secured Claim which cannot be supported by the cash flow of the Property (estimated to be approximately $580,524).

- Post-confirmation payment of the Bank's Secured Claim to the extent the payment cannot be supported by the cash flow of the Property.

29

PRINTED ON

RECYCLED PAPER

# III.

# SUMMARY OF THE PLAN

## A.    What Creditors and Interest Holders Will Receive Under The Plan

As required by the Bankruptcy Code, the Plan classifies claims and interests in various classes according to their right to priority.  The Plan states whether each class of claims or interests is impaired or unimpaired.  The Plan provides the treatment each class will receive.

## B.    Unclassified Claims

Certain types of claims are not placed into voting classes; instead they are unclassified. They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code.  As such, the Debtor has <u>not</u> placed the following claims in a class:

### 1.    Administrative Expenses

Administrative expenses are claims for costs or expenses of administering the Case that are allowed under Bankruptcy Code Section 507(a)(1).  The Bankruptcy Code requires that all administrative claims be paid on the Effective Date unless a particular claimant agrees to a different treatment.

The following chart lists <u>all</u> of the Debtor's § 507(a)(1) administrative claims and their treatment under the Plan:

| Name | Amount Owed | Treatment |
|------|-------------|-----------|
| Levene, Neale, Bender, Rankin & Brill L.L.P. ("LNBRB"), Debtor's bankruptcy counsel | $100,000 (estimated, and in excess of pre-petition retainer paid in the amount of approximately $200,000) | Paid in full from contribution by Title Acquisition upon the later of (a) Effective Date; and (b) 11 days after date of entry of Order allowing the final fee application. |
| Greenberg Traurig ("GT"), Debtor's special counsel | $75,000 (estimated, could be higher based on litigation with contractor or subcontractors) | Paid in full from contribution by Title Acquisition upon the later of (a) Effective Date; and (b) 11 days after date of entry of Order allowing the final fee application. |

PRINTED ON

RECYCLED PAPER

| Name | Amount Owed | Treatment |
|---|---|---|
| Debtor's real estate appraiser | $10,000 (estimated) | Paid in full from contribution by Title Acquisition upon the later of (a) Effective Date; and (b) 11 days after date of entry of Order allowing the final fee application. |
| Debtors' accountant | $10,000 (estimated) | Paid in full from contribution by Title Acquisition upon the later of (a) Effective Date; and (b) 11 days after date of entry of Order allowing the final fee application. |
| Clerk's Office Fees | $0 (estimated) | Paid in full from contribution by Title Acquisition on the Effective Date. |
| Office of the U.S. Trustee Fees | $0 (estimated) | Paid in full from contribution by Title Acquisition on the Effective Date. |
| **TOTAL** | $195,000 (estimated) | |

Court Approval of Fees Required:

The Court must rule on all fees listed in this chart before the fees will be owed, except for fees owing to the Clerk's Office and U.S. Trustee or fees to be paid from non-Debtor sources. The professional in question must file and serve a properly noticed fee application, and the Court must rule on the application. Only the amount of fees allowed by the Court will be owed and required to be paid under the Plan unless such fees are paid from equity distributions and the equity holder(s) waive the need to file fee requests. By not later than 2 business days prior to the Confirmation Hearing, Title Acquisition will deposit the sum of $200,000 with LNBRB, which shall maintain such funds in a segregated client trust account. These funds shall be used to pay the fees and expenses allowed by the Court. Based on the foregoing, the Debtor submits that the Debtor will have sufficient funds to satisfy the foregoing administrative claims.

2.      **Priority Tax Claims**

Priority tax claims are certain unsecured income, employment and other taxes described by Bankruptcy Code Section 507(a)(8). The Bankruptcy Code requires that each holder of such

PRINTED ON

RECYCLED PAPER

a Section 507(a)(8) priority tax claim receive the present value of such claim in deferred cash payments, over a period not exceeding six years from the date of the assessment of such tax. The Debtor does not believe that there are any priority tax claims, however two (2) priority tax claims have been filed as follows. These claims will be paid on the Effective Date of the Plan from the Unsecured Creditors' Fund (as defined below).

| Name | Amount Owed | Treatment |
|------|-------------|-----------|
| Internal Revenue Service | $200.00 | Paid in full by the Reorganized Debtor from the Net Capital Contribution made by Building Lessee on the Effective Date. |
| Los Angeles County Treasurer & Tax Collector | $21,983.48 | Paid in full by the Reorganized Debtor from the Net Capital Contribution made by Building Lessee on the Effective Date. |
| Franchise Tax Board | $800.00 | Paid in full by the Reorganized Debtor from the Net Capital Contribution made by Building Lessee on the Effective Date. |
| **TOTAL** | $22,983.48 | |

**C.      Classified Claims and Interests**

**1.    Class of Secured Claims**

Secured claims are claims secured by liens on property of the estate. The following chart lists the classes containing the Debtor's secured pre-petition claims and their treatment under the Plan:

32

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| 1 | Secured claim of: Bank of America, N.A.

Collateral description = Debtor's fee simple interest in the Property

Claim Priority = First Deed of Trust, but junior to statutory tax lien of Los Angeles County Tax Collector

Collateral value = approx. $24,759,000 (if Bank does not consent to treatment of Bank's Secured Claim under the Plan or an agreement is not reached between the Debtor and the Bank regarding the treatment of Bank's Secured Claim, a new appraisal will be obtained by the Debtor which may be needed for confirmation of the Plan)

Amount of Claim = Approx. $25,203,012.64 as of May 8, 2009**

**Debtor does not agree to this claim amount.  The Debtor is in the process of verifying the accuracy of the Bank's claim and reserves all rights to object. | N | Y

(Creditor in this class is entitled to vote on the Plan) | On the Effective Date, the Bank shall have an allowed secured claim equal to the market value of the Property (the "Bank's Secured Claim").

 The Bank's Secured Claim shall accrue interest at the rate of LIBOR plus 200 basis points from the Effective Date.

 The Bank's Secured Claim shall not be amortized, and the Reorganized Debtor shall make monthly interest only payments, with the first payment due on the first business day of the second full month following the Effective Date (with such payment to cover the period from the Effective Date to the end of the first full month), and all subsequent payments due on the first business day of the month (for interest accrued during the prior month). The Bank's Secured Claim shall mature on the 5th anniversary date following the Effective Date.

 Capri shall guarantee payment of all interest payable with respect to the Bank's Secured Claim, with such guarantee to be in the form attached as Exhibit "3" attached hereto.

 Capri shall also provide a non-recourse guarantee in the form attached as Exhibit "4" attached hereto for the usual and customary exceptions, such as losses or damages suffered by the Bank with respect to any fraud, misrepresentations or reckless damage to the Property by the Reorganized Debtor, failure to pay taxes or assessments to the extent funds generated by the Property have been misapplied by the Reorganized Debtor, or misapplication of insurance or condemnation proceeds, security deposits or rents by the Reorganized Debtor.

 The Reorganized Debtor shall have the right to prepay the Bank's Secured Claim at any time without penalty or fees. |

PRINTED ON

RECYCLED PAPER

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| | | | | Pending satisfaction in full of the Bank's Secured Claim and all accrued, unpaid interest, the Bank shall retain its first priority deed of trust upon the Property. In addition, the "*Agreement to Rescind Subordination of Master Lease between Bank of America, N.A. and Banc of America Historic Capital Assets LLC*" shall remain in place. |

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| 2 | Secured claim of: Los Angeles County Tax Collector ("LA County")<br><br>Collateral description = Debtor's fee simple interest in the Property<br><br>Claim Priority = Statutory tax lien, senior to the first priority deed of trust in favor of the Bank<br><br>Collateral value = approx. $24,759,000 (new appraisal being obtained by the Debtor)<br><br>Amount of Claim = Approx. $167,063.70 | N | Y<br><br>(Creditor in this class is entitled to vote on the Plan) | The Reorganized Debtor shall pay an amount equal to one-half of LA County's allowed claim on the Effective Date of the Plan from the Net Capital Contribution. Title Acquisition shall pay the remaining one-half of LA County's allowed claim by the third month of the Effective Date of the Plan. |

### 2.    Classes of Priority Unsecured Claims

Certain priority claims that are referred to in Bankruptcy Code Sections 507(a)(3), (4), (5), (6), and (7) are required to be placed in classes. These types of claims are entitled to priority treatment as follows: the Bankruptcy Code requires that each holder of such a claim receive cash on the Effective Date equal to the allowed amount of such claim. However, a class of unsecured priority claim holders may vote to accept deferred cash payments of a value, as of the Effective Date, equal to the allowed amount of such claims. The Debtor is not aware of any claims that

PRINTED ON

RECYCLED PAPER

would qualify as Sections 507(a)(3), (a)(4), (a)(5), (a)(6), and (a)(7) priority unsecured claims under the Plan.

### 3.    Class of General Unsecured Claims

General unsecured claims are unsecured claims not entitled to priority under Bankruptcy Code Section 507(a).    The following chart identifies the Plan's treatment of the classes containing <u>all</u> of the Debtor's general unsecured claims (non-insider claims and subordinated insider claims have been separately classified):

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| 3 | <u>Claims:</u> All Allowed General Unsecured Claims, including any deficiency unsecured claim of the Bank, claims asserted by holders of mechanic's liens and all other general unsecured claims, but excluding claims of insiders (i.e., Title Acquisition).<br><br><u>Amount of Claims</u> = Approximately $444,012.64 (Bank's unsecured deficiency claim assuming claim of $25,203,012.64 and market value of Property of $24,759,000); <u>plus</u><br><br>Approximately $3.1 million (Based on claims filed on or before the bar date for filing proofs of claim in this case).<br><br><u>Total</u>:  Approximately $3.5 million | N | Y<br><br>(Creditors in this class are entitled to vote on the Plan) | On the Effective Date of the Plan, non-insider creditors holding allowed general unsecured claims shall receive his, her or its <u>pro rata</u> share of the sum of $1 million paid by the Reorganized Debtor from the Net Capital Contribution.<br><br>Assuming total non-insider general unsecured claims of $3.5 million, the estimated return to creditors would be approximately 30% of their allowed claims.  The actual distribution could vary depending on, among other things, proofs of claim filed by creditors, and the outcome of possible objections to claims.<br><br>The bar date for filing proofs of claim in this case was August 17, 2009.  <u>Exhibit "7"</u> attached hereto lists all proofs of claims filed on or before the bar date by unsecured creditors, including claims asserted by holders of mechanic's liens. |

PRINTED ON

RECYCLED PAPER

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| 4 | Claims: Insider General Unsecured Claim of Title Acquisition). Amount of Claims = Approximately $10,975,174 | Y | Y (Creditor in this class is deemed to have rejected the Plan) | Title Acquisition shall receive no payment on account of its claim under the Plan. |

### 4.    Class of Interest Holders

Interest holders are the parties who hold an ownership interest (i.e., equity interest) in the Debtor.  The following chart identifies the Plan's treatment of the class of interest holders:

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 5 | All Equity Interests in Debtor | N (Interest Holders in this class are not entitled to vote on the Plan) | Building Lessee shall retain its 15% interest in the Debtor in exchange for contributing approximately $150,000 of the Supplemental Capital Contribution. Title Acquisition shall retain its 85% interest in the Debtor in exchange for all of the Title Acquisition Contributions as described in Section II, C, 9 above. |

## D.    Means of Effectuating the Plan

### 1.    Funding for the Plan

There are three sources of funding for the Plan, as follows:

(a)    Net Capital Contribution - Cash in the sum of approximately $1.3 million which will be contributed to the Debtor by Building Lessee from proceeds that it receives from the Tax Investor, which will be used to make the payments required under the Plan to Class 2 creditor on the Effective Date of the Plan, holders of allowed priority tax claims in full, and $1 million to Class 3 creditors to be shared on a pro rata basis.

PRINTED ON

RECYCLED PAPER

(b) <u>Supplemental Capital Contribution</u> - Cash in the sum of approximately $400,000 which will be contributed to the Debtor by Building Lessee from proceeds that it receives from the Tax Investor.  Of this amount, $150,000 shall be the "new value" contribution by Building Lessee to the Debtor to keeping its 15% interest in the Reorganized Debtor.  All Supplemental Capital Contribution shall be utilized by the Reorganized Debtor for working capital purposes or to fund payments required to be made to the Class 1 creditor (interest payments for the Bank's Secured Claim).

(c) <u>Title Acquisition Contributions</u> – Cash in the sum of approximately $200,000 will be contributed to the Debtor by Title Acquisition, which will be used to make the payments required to be made to the estate's professionals for allowed fees and expenses.  Additional cash in the sum of approximately $85,000 will be contributed to the Debtor by Title Acquisition, which will be used to make the payment required to be made to LA County.  Title Acquisition will also make up to $1 million in contributions necessary for timely remittance of all payments required to be made to the Class 1 creditor (Bank) to the extent the cash flow of the Property does not support such payments which is expected to be approximately $600,000.  Title Acquisition has also already contributed approximately $60,000 to pay for the Debtor's insurance and fund operating shortfalls with respect to the Property.

**2.  Post-Confirmation Management**

The post-confirmation management of the Reorganized Debtor shall remain the same as the Debtor's pre-confirmation management.  Title Acquisition shall continue to serve as the Manager of the Reorganized Debtor following confirmation of the Plan.

///

///

PRINTED ON
RECYCLED PAPER

### 3.  Disbursing Agent

Levene, Neale, Bender, Rankin & Brill L.L.P. ("LNBRB") shall act as the Disbursing Agent for purposes of making all distributions provided for under the Plan.  LNBRB shall open a segregated interest-bearing account for purposes of maintaining estate funds, with interest to accrue for the benefit of the estate.  The Disbursing Agent shall serve without bond.

### 4.  Objections to Claims

Pursuant to 11 U.S.C. § 502(a), any party in interest may assert objections to claims. Objections to claims shall be filed not later than 60 days after the date of entry of Order confirming the Plan.  As provided by Section 502(c) of the Bankruptcy Code, the Court may estimate any contingent or unliquidated disputed claim for purposes of confirmation of the Plan. The Court shall retain jurisdiction over the Debtor, the Reorganized Debtor and the Case to resolve such objections to claims following the confirmation of the Plan.

Nothing contained in the Plan shall constitute a waiver or release by the Debtor of any rights of setoff or recoupment, or of any defense, it may have with respect to any claim.  The Disbursing Agent will withhold from property to be distributed under the Plan and will place in reserve a sufficient amount of cash to be distributed on account of claims that are disputed and have not been allowed as of the date of distribution to creditors ("Disputed Claims") of any particular class as if such claims were allowed in full.

### 5.  Interest Pending Allowance of Claims

Except as specifically provided for in the Plan, in the order confirming the Plan, or in some other order of the Court, interest shall not accrue on claims and no holder of a claim shall be entitled to interest accruing on or after the Petition Date on any claim.

PRINTED ON

RECYCLED PAPER

To the extent the Debtor or any other party in interest objects to the allowance of any claim, nothing in the Plan or herein shall be deemed to imply or create for the holders of any Disputed Claims any entitlement to receive interest upon the allowed amount of any such Disputed Claims as a result, *inter alia*, of the delay in payment of such claims, except as expressly stated in the treatment pursuant to the Plan.

**6.    Distributions to be Made Pursuant to the Plan**

Distributions to be made by the Reorganized Debtor on the Effective Date on account of any claim shall be made on the Effective Date or as promptly thereafter as practicable. Distributions to be made by the Disbursing Agent under the Plan shall be made by check drawn on a domestic bank or by wire transfer, at the sole election of the Disbursing Agent.

Except as otherwise agreed to by the Disbursing Agent in writing, distributions to be made to holders of allowed claims pursuant to the Plan may be delivered by regular mail, postage prepaid, to the address shown in the Debtor's schedules, as they may from time to time be amended in accordance with Bankruptcy Rule 1009, or, if a different address is stated in a proof of claim duly filed with the Court, to such address.

Checks issued by the Reorganized Debtor or the Disbursing Agent to pay allowed claims shall be null and void if not negotiated within sixty (60) days after the date of issuance thereof. Requests for reissuance of any check shall be made to the Reorganized Debtor by the holder of the allowed claim to whom such check originally was issued, prior to the expiration of 120 days from the date of issuance of such check.  After such date, the claim shall be deemed disallowed and the monies otherwise payable on account of such claim shall revest in the Reorganized Debtor free and clear of all claims and interests.

PRINTED ON

RECYCLED PAPER

In connection with the Plan and any instruments issued in connection therewith, the Reorganized Debtor shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements.

**7.      Exculpations and Releases**

To the maximum extent permitted by law, none of the Debtor, the estate, nor any of their employees, agents, representatives, or the professionals employed or retained by any of them, whether or not by Bankruptcy Court order (each, an "Released Person"), shall have or incur liability to any person or entity for an act taken or omission made in good faith in connection with or related to the formulation of the Plan, the Disclosure Statement, or a contract, instrument, release, or other agreement or document created in connection therewith, the solicitation of acceptances for or confirmation of the Plan, or the consummation and implementation of the Plan and the transactions contemplated therein.  Each Released Person shall in all respects be entitled to reasonably rely on the advice of counsel with respect to its duties and responsibilities under the Plan.

**8.      Injunctions**

The occurrence of the Effective Date after the entry of the Confirmation Order shall enjoin the prosecution, whether directly, derivatively or otherwise, of any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, liability or interest released, discharged or terminated pursuant to the Plan.

Except as provided in the Plan or the Confirmation Order, as of the Effective Date, all entities that have held, currently hold or may hold a claim or other debt or liability that is discharged or an interest or other right of an equity security holder that is terminated pursuant to

PRINTED ON

RECYCLED PAPER

the terms of the Plan are permanently enjoined from taking any of the following actions against the Debtor, the Estate, or their property on account of any such discharged claims, debts or liabilities or terminated interests or rights: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien or encumbrance; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtor; and (v) commencing or continuing any action in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

By accepting distribution pursuant to the Plan, each holder of an allowed claim or allowed interest receiving distributions pursuant to the Plan will be deemed to have specifically consented to the injunctions set forth in this Section.

**E.    Risk Factors**

There is little foreseeable risk of default for payments required to be made under the Plan.

The Debtor contends that Tax Investor is required under the Building Lessee Operating Agreement to contribute the Capital Contribution (i.e., $1,712,535).  Upon confirmation of the Plan, Tax Investor will fund the Capital Contribution and upon receipt of a certification from an accountant satisfactory to the Tax Investor that the remaining Tax Credits are available based on the final construction costs of the project, Tax Investor also will fund the Supplemental Capital Contribution (i.e., approximately $400,000) to Building Lessee.  The accountant for Building Lessee is working on such certificate, and the Debtor is extremely confident that the necessary certification will be obtained to ensure that the Estate Funds are released by Tax Investor upon confirmation of the Plan.  Building Lessee, in turn, will pay the Capital Contribution and the

PRINTED ON
RECYCLED PAPER

Supplemental Capital Contribution to the Debtor.  The Tax Investor has the cash to fund these contributions in full upon confirmation of the Plan.

Title Acquisition will fund the sum of $200,000 at least 2 business days prior to the Confirmation Hearing, which is expected to be sufficient to pay all allowed professional fees and expenses of the estate.  Title Acquisition also has the cash to fund the payment due to LA County, and up to $1 million in any shortfalls (estimated to be approximately $600,000) experienced from the cash flow of the Property to meet the payments required to be made under the Plan to the Bank.  Title Acquisition is wholly owned by Capri, which is a financially sound fund managed by Capri Capital Partners ("Capri Capital").  Under the Plan, Title Acquisition will contribute the funds necessary to address any shortfalls so as to avoid default by the Reorganized Debtor of its payment obligations to the Bank under the Plan.  As set forth above, Capri is a private real estate investment company formed in 2004 to acquire, originate and manage a portfolio of commercial real estate and real estate-related assets.  Capri was originally capitalized with $312.5 million in contributed capital from institutional investors.  The investors include primarily pension funds, which provide retirement income for elderly, hard working, retired public employees, such as teachers, police and firemen, but do not include investment vehicles such as hedge funds or "fund of funds" type structures.  As of March 31, 2009, Capri reported on its unaudited Consolidated Balance Sheet total assets of approximately $542.9 million and net assets (less liabilities) of approximately $166.5 million.  The manager of Capri is Capri Capital, a privately held, SEC-registered real estate investment advisory firm headquartered in Chicago, Illinois. Capri Capital (and/or its predecessor entities) date back to 1992. Capri Capital is an experienced investor in commercial real estate equity and debt markets and represents some of the largest pension funds and other institutional investors in the United

42

States.  As of March 31, 2009, Capri Capital had approximately $4.2 billion in real estate assets under management, diversified by geography and product type (with a high concentration and focus in the multi-family residential product).  Therefore, there is no doubt that Title Acquisition will have sufficient financial wherewithal to make the necessary payments under the Plan.

**F.    Other Provisions of the Plan**

    **1.    Executory Contracts and Unexpired Leases**

        **a)    Assumptions**

The Debtor is not a party to any executory contract.  The only unexpired lease to which the Debtor is a party is the Master Lease Agreement with Building Lessee.  On the Effective Date, Reorganized Debtor will assume the Master Lease Agreement with Building Lessee, subject to the amendments which the Debtor has agreed to as described in this Disclosure Statement.  The Confirmation Order, subject to the occurrence of the Effective Date, will constitute a Court order approving the assumption, on the Effective Date, of the Master Lease Agreement, as amended.

        **b)    Rejections**

Other than the Master Lease Agreement between the Debtor and Building Lessee, the Debtor is not aware of any executory contract or unexpired lease to which it is a party.  If any such contract or lease exists, they shall be deemed rejected.  The Confirmation Order, subject to the occurrence of the Effective Date, shall constitute an Order approving the Debtor's rejection of all such executory contracts and unexpired leases.

THE  BAR  DATE  FOR  FILING  A  PROOF  OF  CLAIM  BASED  ON  A  CLAIM ARISING FROM THE REJECTION OF AN EXECUTORY CONTRACT OR UNEXPIRED LEASE WILL BE 30 DAYS AFTER DATE OF ENTRY OF THE CONFIRMATION ORDER.

PRINTED ON

RECYCLED PAPER

Any claim based on the rejection of an executory contract or unexpired lease will be barred if the proof of claim is not timely filed, unless the Court orders otherwise.

### 2.    Changes in Rates Subject to Regulatory Commission Approval

The Debtor is not subject to governmental regulatory commission approval of its rates.

### 3.    Retention of Jurisdiction

After confirmation of the Plan and occurrence of the Effective Date, in addition to jurisdiction which exists in any other court, the Bankruptcy Court will retain such jurisdiction as is legally permissible including for the following purposes:

a.    To resolve any and all disputes regarding the operation and interpretation of the Plan and the Confirmation Order;

b.    To determine the allowability, classification, or priority of claims and interests upon objection by the Debtor, the Reorganized Debtor, or by other parties in interest with standing to bring such objection or proceeding;

c.    To determine the extent, validity and priority of any lien asserted against property of the Debtor or property of the Debtor's estate.

d.    To construe and take any action to enforce the Plan, the Confirmation Order, and any other order of the Court, issue such orders as may be necessary for the implementation, execution, performance, and consummation of the Plan, the Confirmation Order, and all matters referred to in the Plan, the Confirmation Order, and to determine all matters that may be pending before the Court in this case on or before the Effective Date with respect to any person or entity related thereto;

44

e.      To determine (to the extent necessary) any and all applications for allowance of compensation and reimbursement of expenses of professionals for the period on or before the Effective Date;

f.      To determine any request for payment of administrative expenses;

g.      To determine all applications, motions, adversary proceedings, contested matters, and any other litigated matters instituted during the pendency of this case whether before, on, or after the Effective Date;

h.      To determine such other matters and for such other purposes as may be provided in the Confirmation Order.

i.      To modify the Plan under Section 1127 of the Bankruptcy Code in order to remedy any apparent defect or omission in the Plan or to reconcile any inconsistency in the Plan so as to carry out its intent and purpose;

j.      Except as otherwise provided in the Plan or the Confirmation Order, to issue injunctions to take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Plan or the Confirmation Order, or the execution or implementation by any person or entity of the Plan or the Confirmation Order;

k.      To issue such orders in aid of consummation of the Plan or the Confirmation Order, notwithstanding any otherwise applicable nonbankruptcy law, with respect to any person or entity, to the fullest extent authorized by the Bankruptcy Code or Bankruptcy Rules; and

l.      To enter a final decree closing this Case.

45

### G.    Tax Consequences of Plan

CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY ARE URGED TO CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS. The following disclosure of possible federal income tax consequences is informational only and is intended solely for the purpose of alerting readers about possible, but not all, tax issues this Plan may present to the holder of a claim. The Debtor CANNOT and DOES NOT represent that the tax consequences contained below are the only tax consequences of the Plan because the Tax Code, as well as Treasury Regulations, judicial and administrative authorities or interpretations, embodies many complicated rules which make it difficult to state completely and accurately all the tax implications of any action. No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan. No rulings or determinations of the Internal Revenue Service ("IRS") have been requested. No representations are being made regarding the particular tax consequences of the Plan.

The tax consequences of the Plan to a holder of a claim will depend, in part, on the type of consideration received for the claim, whether the holder is a resident of the United States for tax purposes, whether the holder has taken a bad debt deduction with respect to the claim (or a portion thereof), and whether the holder reports income on the accrual or cash basis method. Holders of claims likely will recognize gain or loss, as the case may be, equal to the difference between the amount realized under the Plan in respect of their claims and their respective adjusted tax basis in their claims. The amount realized for this purpose generally will equal the sum of cash and the fair market value of any other consideration received under the Plan in

PRINTED ON

RECYCLED PAPER

respect of their claims.  Any gain or loss recognized in the exchange will be capital or ordinary depending on the status of the claim in the holder's hands.

THE ABOVE DISCUSSION IS INTENDED AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN, IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES OF THE PLAN ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON THE INDIVIDUAL CIRCUMSTANCES OF THE HOLDERS OF CLAIMS AND INTERESTS.  *ACCORDINGLY, HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE, LOCAL, AND, IF APPLICABLE, FOREIGN TAX CONSEQUENCES OF THE PLAN.*

## IV.

## CONFIRMATION REQUIREMENTS AND PROCEDURES

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OR THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.  The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing claims. The Debtor CANNOT and DOES NOT represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Court can confirm the Plan.  Some of the requirements include that the Plan must be proposed in good faith, acceptance of the Plan, whether the Plan pays creditors at least as much as creditors would receive in a Chapter 7

PRINTED ON
RECYCLED PAPER

liquidation, and whether the Plan is feasible.  These requirements are <u>not</u> the only requirements for confirmation.

## A.  Who May Vote or Object

### 1.  Who May Object to Confirmation of the Plan

Any party in interest may object to the confirmation of the Plan, but, as explained below, not everyone is entitled to vote to accept or reject the Plan.

### 2.  Who May Vote to Accept/Reject the Plan

A creditor or interest holder has a right to vote for or against the Plan if that creditor or interest holder has a claim which is both (1) allowed or allowed for voting purposes and (2) classified in an impaired class.

#### a)  What Is an Allowed Claim/Interest

As noted above, a creditor or interest holder must first have an <u>allowed claim or interest</u> to have the right to vote.  Generally, any proof of claim or interest will be allowed, unless a party in interest brings a motion objecting to the claim.  When an objection to a claim or interest is filed, the creditor or interest holder holding the claim or interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or interest for voting purposes.

THE COURT HAS ESTABLISHED AUGUST 17, 2009 AS A BAR DATE FOR FILING A PROOF OF CLAIM IN THIS CASE FOR NON-GOVERNMENTAL ENTITIES AND AUGUST 24, 2009 FOR GOVERNMENTAL ENTITIES.  THE COURT HAS ALSO ESTABLISHED AUGUST 17, 2009 AS A BAR DATE FOR FILING REQUESTS FOR ALLOWANCE AND PAYMENT OF ADMINSITRATIVE EXPENSES.  A creditor or interest holder may have an allowed claim or interest even if a proof of claim or interest was not timely

PRINTED ON
RECYCLED PAPER

filed.  A claim is deemed allowed if (1) it is scheduled on the Debtor's schedules and such claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the claim.  An interest is deemed allowed if it is scheduled and no party in interest has objected to the interest.

### b)    What Is an Impaired Claim/Interest

As noted above, an allowed claim or interest only has the right to vote if it is in a class that is <u>impaired</u> under the Plan.  A class is impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class. For example, a class comprised of general unsecured claims is impaired if the Plan fails to pay the members of that class 100% of what they are owed.

In this case, the Debtor believes that holders of claims in classes 1, 2, 3 and 4 are impaired and that classes 1, 2 and 3 are entitled to vote to accept or reject the Plan.  Since class 4 is not receiving anything under the Plan, class 4 is deemed to have rejected the Plan.  Parties who dispute the Debtor's characterization of their claim or interest as being impaired or unimpaired may file an objection to the Plan contending that the Debtor has incorrectly characterized the class.

### 3.    Who is <u>Not</u> Entitled to Vote

The following four types of claims are <u>not</u> entitled to vote: (1) claims that have been disallowed; (2) claims in unimpaired classes; (3) claims entitled to priority pursuant to Bankruptcy Code Sections 507(a)(1), (a)(2), and (a)(8); and (4) claims in classes that do not receive or retain any value under the Plan.  Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted the Plan.  Claims entitled to priority pursuant to Bankruptcy Code Sections 507(a)(1), (a)(2), and (a)(7) are not entitled to vote because such

PRINTED ON

RECYCLED PAPER

claims are not placed in classes and they are required to receive certain treatment specified by the

Bankruptcy Code.  Claims in classes that do not receive or retain any value under the Plan do not

vote because such classes are deemed to have rejected the Plan.  The Debtor believes that

Classes 4 and 5 are not entitled to vote on the Plan.  EVEN IF YOUR CLAIM IS OF THE TYPE

DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE

CONFIRMATION OF THE PLAN.

### 4.    Who Can Vote in More Than One Class

A creditor whose claim has been allowed in part as a secured claim and in part as an

unsecured claim is entitled to accept or reject the Plan in both capacities by casting one ballot for

the secured part of the claim and another ballot for the unsecured claim.

### 5.    Votes Necessary to Confirm the Plan

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one

impaired class has accepted the Plan without counting the votes of any insiders within that class,

and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be

confirmed by "cramdown" on non-accepting classes, as discussed later in Section IV.A.8.  If

necessary, the Debtor will seek cramdown on any class of creditors.

### 6.    Votes Necessary for a Class to Accept the Plan

A class of claims is considered to have accepted the Plan when more than one-half (1/2)

in number and at least two-thirds (2/3) in dollar amount of the claims which actually voted, voted

in favor of the Plan.  A class of interests is considered to have accepted the Plan when at least

two-thirds (2/3) in amount of the interest-holders of such class which actually voted, voted to

accept the Plan.

PRINTED ON

RECYCLED PAPER

### 7.    Treatment of Nonaccepting Classes

As noted above, even if <u>all</u> impaired classes do not accept the Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner required by the Bankruptcy Code.  The process by which nonaccepting classes are forced to be bound by the terms of the Plan is commonly referred to as "cramdown."  The Bankruptcy Code allows the Plan to be "crammed down" on nonaccepting classes of claims or interests if it meets all consensual requirements except the voting requirements of 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired class that has not voted to accept the Plan as referred to in 11 U.S.C. § 1129(b) and applicable case law.

### 8.    Request for Confirmation Despite Nonacceptance by Impaired Class(es)

The Debtor will request cramdown on any impaired classes who do not vote to accept the Plan.

## B.    Liquidation Analysis

Another confirmation requirement is the best interest of creditors test (the "Best Interest Test"), which requires a liquidation analysis.  Under the Best Interest Test, if a claimant or interest holder is in an impaired class and that claimant or interest holder does not vote to accept the Plan, then that claimant or interest holder must receive or retain under the Plan property of a value that is not less than the amount that such holder would receive or retain if the debtor was liquidated under Chapter 7 of the Bankruptcy Code.

In a Chapter 7 case, the debtor's assets are usually sold by a Chapter 7 trustee.  Secured creditors are paid first from the sales proceeds of properties on which the secured creditor has a lien.  Administrative claims are paid next.  Next, unsecured creditors are paid from any remaining sales proceeds, according to their rights to priority.  Unsecured creditors with the same

PRINTED ON

RECYCLED PAPER

priority share in proportion to the amount of their allowed claim in relationship to the amount of total allowed unsecured claims.  Finally, interest holders receive the balance, if any, that remains after all creditors are paid in full.

For the Bankruptcy Court to be able to confirm the Plan, the Bankruptcy Court must find that all impaired creditors and interest holders who do not accept the Plan will receive at least as much under the Plan as such holders would receive under a Chapter 7 liquidation of the Debtor.

The impaired classes of creditors under the Plan are Class 1 (Bank), Class 2 (LA County), Class 3 (non-insider holders of general unsecured claims) and Class 4 (insider holder of a general unsecured claim).  The Plan Proponents believe that it is clear that holders of Classes 1 and 3 allowed claims will receive more money under the Plan than they would in a Chapter 7 liquidation; therefore, the Best Interest Test has been satisfied with respect to any Class 1 or 3 claim holder who does not accept the Plan.  Class 2 will receive at least as much under the Plan as it would receive under a Chapter 7 liquidation of the Debtor; therefore, the Best Interest Test has been satisfied with respect to Class 2 if it does not accept the Plan.  Class 4 consists of the general unsecured claim of the Debtor's insider, Title Acquisition, which has agreed to subordinate its claim to those of allowed non-insider general unsecured claims for purposes of distribution under the Plan and for no other purposes.  Under the Plan, Class 4 receives nothing, and, therefore, is deemed to have rejected the Plan.

There is no question that creditors in Classes 1, 2, 3 and 4 would <u>not</u> do better through a Chapter 7 liquidation as compared to the Plan.  In the event the Case is converted to one under Chapter 7, because the Bank's claim may be higher than the value of the Property (<u>i.e.</u>, no equity for the estate), the trustee is likely to stipulate to relief from stay to allow the Bank to exercise its rights and remedies against the Property.  In such event, all of the estate's general unsecured

52

creditors in Classes 3 and 4 would receive nothing on account of their claims.  However, under the Plan, creditors in Class 3 is currently estimated to receive approximately 30% of their allowed claims, and even though the insider creditor in Class 4 will not receive anything under the Plan, the Plan is not any worse than what it would receive in Chapter 11.

Class 1 also receives better treatment under the Plan than in Chapter 7.  Under the Plan, the Bank will receive in cash, the full value of the present market value of the Property, with market interest, and certain guarantee protections from Capri.  The Bank also retains its first priority deed of trust upon the Property.  In Chapter 7, the Property will be liquidated by the Bank pursuant to a foreclosure sale which will not result in the realization of the full market price for the asset.  Additionally, the Bank will incur more fees and costs associated with having to foreclose upon the Property, thereby further diluting its return on its claim.

Additionally, in a Chapter 7 case, the Chapter 7 trustee would likely be required to retain new professionals to replace the Debtor's professionals, which will burden the estate with additional fees.  These additional expenses are avoided through the confirmation of a plan of reorganization.

Below is a demonstration, in balance sheet format, that all creditors and interest holders will receive at least as much under the Plan as such creditors would receive under a Chapter 7 liquidation (this information is provided by the Debtor and from an evaluation of the Debtor's assets):

| ASSETS VALUED AT LIQUIDATION VALUES (ESTIMATED AS OF SEPTEMBER 1, 2009): | |
|---|---|
| | |
| CURRENT ASSETS | |
| The Property | $23,759,000 |

PRINTED ON

RECYCLED PAPER

| | |
|---|---|
| TOTAL EXPECTED CURRENT ASSETS | $23,759,000 |
| FIXED ASSETS | $0 |
| TOTAL FIXED ASSETS | $0 |
| OTHER ASSETS[4] | $0 |
| TOTAL OTHER ASSETS | $0 |
| **TOTAL ASSETS AT LIQUIDATION VALUE** | $23,759,000 |
| **Less**: | |
| Secured claims | |
| Los Angeles County Tax Collector | $167,063.70 |
| Bank of America, N.A. | $25,203,012 |
| **Less:** | |
| Chapter 7 trustee fees and expenses (including the fees and expenses of the Chapter 7 trustee's professionals) | $50,000 est. |
| **Less:** | |
| Chapter 11 administrative expenses | $195,000 est. |
| **Less:** | |
| Priority claims, excluding administrative expense claims | $23,000 est. |
| Balance for unsecured claims | $0 |
| Total amount of unsecured claims (est.) | $3,500,000 est. |

**% OF THEIR CLAIMS WHICH GENERAL UNSECURED CREDITORS WOULD RECEIVE OR RETAIN IN A CHAPTER 7 LIQUIDATION: = 0%**

**% OF THEIR CLAIMS WHICH NON-INSIDER UNSECURED CREDITORS WILL RECEIVE OR RETAIN UNDER THE PLAN: = 30% (est.)**

Below is a demonstration, in tabular format, that all creditors and interest holders will

---

[4] The Debtor has miscellaneous personal property which has nominal value, if any. Other assets include the approximately $1.6 in unpaid "Rents" due by Building Lessee under the Master Lease Agreement and the unpaid contribution by Building Lessee of $1,712,535, In the event of a liquidation under Chapter 7, these assets have zero value because Building Lessee will have no funds to pay these obligations.

PRINTED ON
RECYCLED PAPER

receive at least as much under the Plan as they would receive under a Chapter 7 liquidation.

| CLAIMS & CLASSES | PAYOUT PERCENTAGE UNDER THE PLAN | PAYOUT PERCENTAGE IN CHAPTER 7 LIQUIDATION |
|---|---|---|
| Administrative Claims | 100% | 0% |
| Priority Tax Claims | 100% | 0% |
| Class 1 – Bank of America, N.A. | 100% | Uncertain |
| Class 2 – Los Angeles County Tax Collector | 100% | 100% |
| Class 3 – Non-insider General Unsecured Creditors | Approx. 30% | 0% |
| Class 4 – Insider General Unsecured Creditors | 0% | 0% |
| Class 5 – Interests in the Debtor | 0% | 0% |

Based on the foregoing, the Debtor therefore believes that holders of all classes of claims will receive no less under the Plan than they would receive in a Chapter 7 liquidation of the Debtor.

## C.    Feasibility

Another requirement for confirmation involves the feasibility of the Plan, which means that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

There are at least two important aspects of a feasibility analysis.  The first aspect considers whether the Debtor will have enough cash on hand on the Effective Date to pay all the claims and expenses which are entitled to be paid on such date.  The Debtor maintains that this

PRINTED ON

RECYCLED PAPER

aspect of feasibility is satisfied because upon confirmation of a Plan, the Tax Investor will contribute the Capital Contribution ($1,712,535) and the Supplemental Capital Contribution (approximately $400,000) and there are sufficient Estate Funds otherwise available to make all other required payments.  The Net Capital Contribution (estimated to be approximately $1.3 million) will be used to pay one-half of the allowed claim of the Class 2 creditor and to pay $1 million to Class 3 creditors on the Effective Date to be shared on a pro rata basis, and Title Acquisition will fund all allowed administrative claims of professionals employed in this case.

The second aspect considers whether the Debtor will have enough cash over the life of the Plan to make the required Plan payments.  Attached hereto as <u>Exhibit "6"</u> is a monthly cash flow projection of the Property over the next 7 years, starting June 2009.  Based on this projection, the Property is expected to experience in shortfalls (<u>i.e.</u>, negative cash flow after debt service payments to the Bank) every month from December 1, 2009 to March 31, 2010 totaling $580,524.  Under the Plan, Title Acquisition will contribute up to $1 million in any funds necessary to address any shortfalls so as to avoid default by the Reorganized Debtor of its payment obligations to the Bank under the Plan.  As aforementioned, Title Acquisition is wholly owned by Capri, which is a financially sound fund managed by Capri Capital.  Therefore, there is no doubt that Title Acquisition will have sufficient financial wherewithal to make the necessary payments under the Plan.

PRINTED ON
RECYCLED PAPER

## V.

## EFFECT OF CONFIRMATION OF PLAN

**A.    Discharge**

Subject to the provision below, confirmation shall bind the Debtor, all creditors, and other parties in interest to the provisions of the Plan whether or not the claim of such creditor is impaired under the Plan and whether or not such creditor has accepted the Plan.

Except as otherwise provided herein or in the Confirmation Order, on the Effective Date, to the extent applicable, the Debtor will be discharged from any debt that arose before confirmation of the Plan, and any debt of a kind specified in Section 502(g), 502(h) or 502(i) of the Bankruptcy Code whether or not a proof of claim based on such debt was filed or deemed filed under Section 501 of the Bankruptcy Code, such claim was allowed under Section 502 of the Bankruptcy Code or the holder of such claim accepted the Plan.

Subject to the provision below, nothing contained herein shall limit the effect of confirmation as described in Sections 524 and/or 1141 of the Bankruptcy Code, and on the Effective Date, the Debtor shall be deemed discharged and released to the fullest extent permitted by Section 1141 of the Bankruptcy Code.

Subject to the provision below, on or after the Effective Date, all parties that have held, currently hold, or may hold a claim discharged pursuant to the terms of the Plan shall be permanently enjoined by Section 524 of the Bankruptcy Code from taking any of the following actions on account of any such discharged claim:  (a) commencing or continuing in any manner any action or other proceeding against the Reorganized Debtor, (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Reorganized Debtor, provided, however, that the foregoing injunction shall not apply to bar any

57

claim of recoupment or setoff, (c) creating, perfecting, or enforcing any lien or encumbrance against the Reorganized Debtor, and (d) commencing or continuing any action, in any manner, in any place, that does not comply with or is inconsistent with the provisions of the Plan or Confirmation Order. Any person violating such injunction may be liable for actual damage, including costs and attorneys' fees and, in appropriate circumstances, punitive damages.

**B.      Revesting of Property in the Reorganized Debtor**

Except as provided elsewhere herein, the confirmation of the Plan revests all of the property of the estate in the Reorganized Debtor. In addition, on the Effective Date, all of the claims against and/or interests in third parties that constitute property of the estate shall be revested in the Reorganized Debtor. Following the Effective Date, the Reorganized Debtor shall have absolute authority to prosecute, waive, adjust or settle any claims without the need for approval by the Court. Following the Effective Date, the Reorganized Debtor shall have the authority to employ such professionals as he deems necessary to prosecute or defend such claims asserted without the need for Court approval.

**C.      Default**

Except as otherwise provided herein or in the Confirmation Order, in the event that the Reorganized Debtor or the Disbursing Agent shall default in the performance of any of its obligations under the Plan and shall not have cured such a default within thirty (30) days after receipt of written notice of default from the creditor to whom the performance is due, then the entity or individual to whom the performance is due may pursue such remedies as are available at law or in equity. An event of default occurring with respect to one claim shall not be any event of default with respect to any other claim.

PRINTED ON

RECYCLED PAPER

**D.    Modification of Plan**

The Debtor may modify the Plan at any time before confirmation.  However, the Court may require a new disclosure statement and/or revoting on the Plan.

The Debtor may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated <u>and</u> (2) the Court authorizes the proposed modifications after notice and a hearing.

**E.    Post-Confirmation Status Report**

Within 120 days of the entry of the order confirming the Plan, the Debtor shall file a status report with the Court explaining what progress has been made toward consummation of the confirmed Plan.  The status report shall be served on the United States Trustee, the twenty largest unsecured creditors, and those parties who have requested special notice after the Effective Date.  Further status reports shall be filed every 120 days and served on the same entities.

**F.    Post-Confirmation Conversion/Dismissal**

A creditor or party in interest may bring a motion to convert or dismiss the Case under § 1112(b) after the Plan is confirmed if there is a default in performing the Plan.  If the Court orders the Case converted to Chapter 7 after the Plan is confirmed, then all property that had been property of the Chapter 11 estate, and that has not been disbursed pursuant to the Plan, will revest in the Chapter 7 estate.  The automatic stay will be reimposed upon the revested property, but only to the extent that the Court did not previously authorize relief from stay during the Case.

The order confirming the Plan may also be revoked under very limited circumstances. The Court may revoke the order if the order of confirmation was procured by fraud and if the

PRINTED ON

RECYCLED PAPER

party in interest brings an adversary proceeding to revoke confirmation within 180 days after the

entry of the order of confirmation.

**G.      Post-Confirmation U.S. Trustee Fees**

The Reorganized Debtor shall be responsible for timely payment of all fees incurred after

the Effective Date pursuant to 28 U.S.C. Section 1930(a)(6).

PRINTED ON

RECYCLED PAPER

**H.     Final Decree**

Once the estate has been fully administered as referred to in Bankruptcy Rule 3022, the Debtor or other party as the Court shall designate in the order confirming the Plan, shall file a motion with the Court to obtain a final decree to close the Case.

Dated: September 21, 2009

TITLE GUARANTEE BUILDING OWNER, LLC, a Delaware limited liability company,

By: _____
Guy A. Mason, Its Authorized
Representative

Presented By:

LEVENE, NEALE, BENDER, RANKIN
    & BRILL, L.L.P.

By: _____
RON BENDER
MONICA Y. KIM
Attorneys for Chapter 11
Debtor and Debtor in Possession

PRINTED ON

## **DECLARATION OF GUY A. MASON**

I, Guy A. Mason, hereby declare as follows:

1.      Unless otherwise set forth herein, I have personal knowledge of the facts set forth herein and, if called to testify, would and could competently testify thereto.

2.      I am the Authorized Representative of Title Guarantee Property Owner, LLC, a Delaware limited liability company, the debtor and debtor in possession herein ("Debtor").

3.      I make this Declaration is support of this First Amended Disclosure Statement (the "Disclosure Statement") which describes the Debtor's First Amended Plan of Reorganization.

4.      To the best of my knowledge, information and belief, all of the information contained in this Disclosure Statement is truthful and accurate.

I declare and verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on this 21st day of September 2009, at Chicago, Illinois.

_____
GUY A. MASON

62