1   ALAN H. MARTIN, Cal. Bar No. 132301
    STEPHANIE M. SEIDL, Cal. Bar No. 253674
2   SHEPPARD MULLIN RICHTER & HAMPTON LLP
    650 Town Center Drive, 4th Floor
3   Costa Mesa, California 92626-1993
    Telephone:    714.513.5100
4   Facsimile:    714.513.5130
    Email:        amartin@sheppardmullin.com
5                 sseidl@sheppardmullin.com

6   Attorneys for Bank of America, N.A.

7

8                   UNITED STATES BANKRUPTCY COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10                        LOS ANGELES DIVISION

11

12  In re                                 Case No. 09-13950-BR

13  TITLE GUARANTEE BUILDING              Chapter 11
    OWNER, LLC,
14                                        **BANK OF AMERICA'S OPPOSITION
                                          TO APPROVAL OF DEBTOR'S
15            Debtor.                     SECOND AMENDED DISCLOSURE
                                          STATEMENT**

16                                        *[Declaration of David Kegaries and
                                          Declaration of Stephanie M. Seidl filed
17                                        concurrently herewith]*

18                                                  **Hearing**

19                                        Date:     October 27, 2009
                                          Time:     10:00 a.m.
20                                        Place:    Courtroom 1668
                                                    Roybal Federal Bldg.
21                                                  255 E. Temple Street
                                                    Los Angeles, CA 90012
22

23

24

25

26

27

28

W02-WEST:1SMS1\402246227.3

# TABLE OF CONTENTS

Page

I. INTRODUCTION ...................................................................................... 1

II. BACKGROUND FACTS ........................................................................ 1

    A.    The Loan From Bank of America To The Debtor .............................. 1

    B.    The Debtor's Default Under The Loan Documents ........................... 2

    C.    The Debtor's Defaults On Obligations To Capri .............................. 3

    D.    Bank of America's Foreclosure Efforts And The Debtor's
        Bankruptcy Filing ............................................................................ 4

    E.    The Property Is Substantially Over Encumbered .............................. 4

    F.    Bank of America's Motion For Relief From Stay .............................. 5

    G.    The Debtor's Second Plan and Disclosure Statement ....................... 5

    H.    The Debtor's Ongoing Dispute From Daniel Swartz ........................ 6

III. THE DISCLOSURE STATEMENT STANDARD .................................. 7

    A.    The Debtor's Disclosure Statement Must Contain "Adequate
        Information" ...................................................................................... 7

    B.    The Court Can Deny Approval Of A Disclosure Statement When
        A Plan Is Unconfirmable On Its Face, Even If It Includes
        Adequate Information ........................................................................ 8

IV. THE DISCLOSURE STATEMENT FAILS TO  PRESENT ADEQUATE
    INFORMATION .......................................................................... 10

V. THE DEBTOR'S SECOND PLAN IS PATENTLY UNCONFIRMABLE ....... 11

    A.    The Debtor's Plan is Not Feasible ..................................................... 12

    B.    The Plan Is Not Feasible Because The Debtor's Actual Income
        and Operating Expenses Demonstrate That It Will Not Be Able
        To Service The Bank's Debt ............................................................... 18

1

    C.     The Plan is Not Fair or Equitable ..........................................21

2

        1.     The Plan Unfairly Shifts the Risk of Failure to the Bank ..........21

3

        2.     The Plan Violates the Absolute Priority Rule ............................23

4

               a.     The Debtor's Plan violates the absolute priority rule

5

                      by paying unsecured creditors prior to paying

6

                      secured creditors in full. ....................................................24

7

               b.     The proposed Plan violates the absolute priority rule

8

                      by allowing equity holders to retain an interest in

9

                      the Property of the estate while not paying 100% of

10

                      the present value of the claims of unsecured

                      creditors. ..........................................................................26

11

               c.     The Debtor's Plan violates the absolute priority rule

12

                      by not allowing for any competition to bid for the

                      equity interests. ................................................................27

13

        3.     The Plan Does Not Provide Market Terms ................................28

14

        4.     Swartz's Continued Interference With the Property Further

15

               Renders Reorganization Unlikely.............................................30

16

VI. CONCLUSION ........................................................................32

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

Cases

Aetna Realty Investors, Inc. v. Monarch Beach Venture, Ltd.
   (In re Monarch Beach Venture, Ltd.),
   166 B.R. 428 (C.D.Cal. 1993) ...................................................21, 24

In re Allied Gaming Mgmt., Inc.,
   209 B.R.201 (Bankr. W.D. La. 1997) ..................................................9

In re Ambanc La Mesa Ltd. Partnership,
   115 F.3d 650 (9th Cir. 1997)...........................................................24

In re Aspen Limousine Service Inc.,
   193 B.R. 325 (D.Colo. 1996) ............................................................7

Bank of America Nat'l Trust Association v. 203 North
   LaSalle Street Partnership,
   526 U.S. 434 (1999) ...............................................................27, 28

In re Beyond.com Corp.,
   289 B.R. 138 (Bankr. N.D. Cal. 2003)..............................................9, 10

In re Bonner Mall  Partnership,
   2 F.3d 899 (9th Cir. 1993). .......................................................21, 23

In re Boulders,
   164 B.R. 99 (9th Cir. B.A.P. 1994) ................................................28, 30

In re  Camino Real Landscape Maintenance Contractors,
   818 F.2d 1503 (9th Cir. 1987) .....................................................28, 30

Matter of Canal Place, Ltd.,
   921 F.2d 569 (5th Cir. 1991) .......................................................12, 17

In re Cardinal Congregate I,
   121 B.R. 760 (Bankr. S.D. Ohio 1990) ...................................................9

Case v. Los Angles Lumber Products, Co., Ltd.,
   308 U.S. 106 (1939) ......................................................................26

In re Century Investment Fund VIII Ltd. Partnership,
   114 B.R. 1003 (Bankr. E.D.Wis. 1990) ..................................................8

In re Consul Restaurant Corp.,
   146 B.R. 979 (Bankr. D.Minn. 1992).....................................................21

In re Copy Crafters Quickprint, Inc.,
   92 B.R. 973 (Bankr. N.D.N.Y. 1988).....................................................7

In re Dakota Rail, Inc.,
   104 B.R. 138 (Bankr. D. Minn. 1989)....................................................8

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

In re Dargahi,
    2008 Bankr. LEXIS 654 (Bankr. C.D.Cal. Mar. 3, 2008).............................28, 29

In re E. Me. Elec.Coop., Inc.,
    125 B.R. 329 (Bankr. D. Me. 1991) .................................................................9

Federal Savings & Loan Ins. Corp. v. D & F Construction, Inc. In re D&F
    Construction Inc.,
    865 F.2d 673 (5th Cir. 1989) ..........................................................................22

In re Felicity Assocs., Inc.,
    197 B.R. 12 (Bankr. D.R.I. 1996) ....................................................................8

In re Fowler,
    903 F.2d 694 (9th Cir. 1990) ..........................................................................29

In re Hobble-Diamond Cattle Co.,
    89 B.R. 856 (Bankr. D. Mont. 1988)...............................................................12

In re Lakeside Global II, Ltd.,
    116 B.R. 499 (Bankr. S.D.Tex. 1989) .............................................................12

In re Mahoney Hawkes, LLP,
    289 B.R. 285 (Bankr. D. Mass. 2002) ..............................................................9

In re Market Square Inn, Inc.,
    163 B.R. 64 (Bankr. W.D. Pa. 1994) ................................................................8

In re Miami Center Associates, Ltd.,
    144 B.R. 937 (Bankr. S.D.Fla. 1992) ..............................................................25

Matter of National Awards Manufacturing, Inc.,
    35 B.R. 691 (Bankr. S.D.Ohio 1983) ..............................................................12

In re O'Leary,
    183 B.R. 338 (Bankr. D. Mass. 1995) ..............................................................9

In re Pecht,
    57 B.R. 137 (Bankr. E.D.Va. 1986) ..................................................................8

In re Petit,
    189 B.R. 227 (Bankr. D. Maine 1995) ..............................................................9

Matter of Pizza of Hawaii, Inc.,
    761 F.2d 1374 (9th Cir. 1985) ........................................................................12

In re S.E.T. Income Props., III,
    83 B.R. 791 (Bankr. N.D. Okla. 1988)..............................................................8

In re Silberkraus,
    253 B.R. 890 (Bankr. C.D. Cal. 2000) ..............................................................9

In re Sloane,
    57 B.R. 91 (Bankr. D.S.C. 1985)....................................................................12

Stewart v. Gurley,
   745 F.2d 1194 (9th Cir. 1984) ........................................................................... 4

Tax Collector v. Pluma (In re Pluma),
   303 B.R. 444 (B.A.P. 9th Cir. 2003) ......................................................... 28, 29

In re Tucson Self-Storage, Inc.,
   166 B.R. 892 (9th Cir. BAP 1994) ................................................................. 26

In re United States Brass Corp.,
   194 B.R. 420 (Bankr. E.D.Tex. 1996) .............................................................. 8

In re Villa Diablo Assocs.,
   156 B.R. 650 (Bankr. N.D.Cal. 1993) ............................................................ 29

## **STATUTES**

11 U.S.C. § 1111 ............................................................................................... 4

11 U.S.C. § 1125(a) ......................................................................................... 7

11 U.S.C. § 1125(b) ......................................................................................... 9

11 U.S.C. § 1129(a)(8) ................................................................................... 21

11 U.S.C. § 1129(a)(11) ........................................................................... 10, 12

11 U.S.C. § 1129(b)(1) ................................................................................... 25

11 U.S.C. § 1129(b)(2)(B) .................................................................... 23, 25, 27

# I.

## INTRODUCTION

In a last-ditch effort to prevent this Court from granting Bank of America N.A.'s ("Bank of America") *Motion for Relief from the Automatic Stay* (the "Relief from Stay Motion"), Title Guarantee Building Owner, LLC (the "Debtor") filed a Second Amended Plan of Reorganization (the "Second Plan").  Remarkably, the Second Plan does not make any attempt to correct the numerous deficiencies that rendered the Debtor's first plan of reorganization (the "First Plan") patently unconfirmable.  Rather, the most significant change from the First Plan to the Second Plan was to improperly artificially impair Class 2 by delaying partial payment to that class for three months.  The failure of the Second Plan to address the problems of the First Plan means that the Debtor has proposed another plan that cannot be confirmed.  As a result, approval of the Debtor's Second Amended Disclosure Statement should be denied, and Bank of America's Relief from Stay Motion should be granted.

# II.

## BACKGROUND FACTS

### A.    The Loan From Bank of America To The Debtor

The Debtor obtained a loan from Bank of America to finance certain costs related to the acquisition, rehabilitation, construction and development of improvements on the Property in the aggregate original principal amount of $23,730,000.00 (the "Loan") pursuant to a Construction Loan Agreement dated as of October 7, 2005 by and between the Debtor and Bank of America (the "Construction Loan Agreement") and modified pursuant to that certain Modification and Additional Advance Agreement dated as of July 17, 2007 by and between the Debtor and Bank of America (the "Modification"), and used the Loan proceeds to acquire the Property on or about October 7, 2005.  Declaration of David Kegaries In Support of Bank of America's Opposition to Approval of Debtor's Second Amended Disclosure Statement ("Kegaries Decl.") ¶ 3.

1    The Loan is evidenced by the Amended and Restated Promissory Note
2  (Construction Loan) made by Debtor to BofA, dated as of July 17, 2007 in the principal
3  amount of $22,618,000.00 (the "Note").   Kegaries Decl. ¶ 4.

4    The Loan is secured by, among other things, a Construction Deed of Trust,
5  Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of
6  October 7, 2005 and recorded in the Official Records of Los Angeles County, California
7  (the "Official Records") on October 14, 2005, as Instrument No. 05 2480511 and modified
8  pursuant to a Modification Agreement (the "Short Form") dated as of July 17, 2007, and
9  recorded in the Official Records on July 18, 2007 as Instrument No. 20071696260 (as
10  modified or amended to date, the "Deed of Trust," and collectively with the documents
11  referenced above, the "Loan Documents").  Kegaries Decl. ¶ 5.  The Deed of Trust
12  encumbers the Property.  Id.  Pursuant to the Deed of Trust, BofA was granted a first
13  priority, perfected lien in the Property.  Id.

14    It is undisputed that BofA holds a valid, perfected, first-priority security
15  interest in the Property.  Kegaries Decl. ¶ 6.

16
17  **B.    The Debtor's Default Under The Loan Documents**
18
19    Prior to the February 23, 2009 (the "Petition Date"), the Debtor defaulted on
20  its obligations under the Note and Deed of Trust by, among others things, (i) failing to
21  make required interest payments under the Loan, (ii) failing to discharge mechanics liens
22  filed against the Property, by payment or filing a bond or otherwise, within thirty (30) days
23  of such filing, and (iii) the occurrence of certain events of default under loan documents
24  executed by the Debtor in connection with a mezzanine loan made to the Debtor by Capri
25  Select Income II, LLC (collectively, the "Events of Default").  Kegaries Decl. ¶ 7.  As a
26  result of the Events of Default and pursuant to the Loan Documents, the Debtor
27  immediately became obligated to repay all amounts owing to Bank of America.  Id.

28

On July 21, 2008, Bank of America sent a default letter to the Debtor, notifying the Debtor of the Events of Default and demanding full and immediate payment of the amounts outstanding under the Loan (the "Outstanding Amounts").  <u>Kegaries Decl.</u> ¶ 8.  The Debtor has failed and refused to pay the Outstanding Amounts. <u>Id.</u>  **Since April 1, 2008, the Debtor has not made any payments to Bank of America in satisfaction of the Outstanding Amounts**. <u>Id.</u>  The aggregate amount outstanding under the Loan Documents is $25,203,012.63.  <u>Id.</u>

In addition, prior to the Petition Date, BofA determined that the Loan-to-Value ratio was below what it needed to be in order to make a restructure of the loan feasible.  <u>Kegaries Decl.</u> ¶ 9. BofA requested an approximate principal paydown of $5 million dollars, which Capri was unwilling to make.  <u>Id.</u>  There have been numerous problems with the development of the Property, including the fact that the project was late in obtaining their final certificate of occupancy (which was eventually received on 1/26/09).  <u>Id.</u>

## C.      <u>The Debtor's Defaults On Obligations To Capri</u>

The Debtor also defaulted on obligations to its mezzanine lender, Capri Select Income II, LLC ("Capri").  <u>Kegaries Decl.</u> ¶ 12.  Capri obtained, as security for its mezzanine loan, security interest in certain assets including the 85% membership interest the Debtor from Brian Hudson, and a 100% membership interest from Daniel Swartz in Title Guarantee Building Manager, LLC (collectively, the "Mezzanine Pledged Assets") Capri assigned the mezzanine loan, including all foreclosure rights, to Title Guarantee Acquisition, LLC (the "Acquisition Company"), and the Acquisition Company conducted a foreclosure sale on certain of the Mezzanine Pledged Assets on December 30, 2008.  <u>Id.</u>

**D.     Bank of America's Foreclosure Efforts And The Debtor's Bankruptcy Filing**

As a result of the Events of Default, Bank of America posted the Property for a foreclosure sale to be conducted on December 1, 2008.  Kegaries Decl. ¶ 10.  The foreclosure sale was subsequently postponed through a series of postponements by Chicago Title Company, as trustee, at Bank of America's request, until February 24, 2009.  Id.  The foreclosure of the Property was stayed by the Debtor's commencement of this case on February 23, 2009 (the "Petition Date").  Id.

**E.     The Property Is Substantially Over Encumbered**

"Equity" has been defined as the difference between the value of the property and all encumbrances against it, including any junior liens.  Stewart v. Gurley, 745 F.2d 1194, 1196 (9th Cir. 1984).  Assuming *arguendo* that the Debtor's appraisal value is correct, that the Property had a value of $23,700,000.00 as of December 31, 2008, the Property remains grossly over encumbered.  The Debtor's own Schedule D lists the value of secured debt as totaling ***$34,975,173.78***,[1] which includes Bank of America's claim and Title Guarantee Acquisition, LLC's claim.[2]  Because junior liens must be taken into account when determining the equity in the Property, ***the Property is over encumbered in excess of $11 million dollars*** using the Debtor's own valuation of the Property.

Moreover, the Debtor's Second Plan fails to recognize that any of the numerous mechanic's liens on the Property may also constitute secured debt.  Specifically, the Plan categorizes all mechanic's liens as "general unsecured creditors" and ignores the

---

[1]     It is unclear as to the Debtor's proposed amounts for the Bank of America's secured claim and a Bank of America unsecured claim.  Accordingly, Bank of America reserves all its potential rights and remedies, including among others those available under 11 U.S.C. § 1111.

[2]     The Debtor schedules do not indicate that the debt to Title Guarantee Acquisition, LLC is contingent, unliquidated, or disputed.

1   fact that these creditors may be secured, which would render the Property even more over

2   encumbered. ***Thus it is clear that the Debtor has no equity in the Property.***

3   **F.    Bank of America's Motion For Relief From Stay**

4

5           After Bank of America determined that it was highly unlikely that that

6   Debtor would propose a Plan of Reorganization that would be acceptable to it, the Bank

7   filed the Relief from Stay Motion with this Court on May 15, 2009.  Kegaries Decl. ¶ 12.

8   In connection with its Opposition to the Relief from Stay Motion, the Debtor filed its First

9   Plan on May 26, 2009.  Id.  Bank of America's Reply to the Debtor's Opposition to the

10  Relief from Stay Motion therefore enumerated an inexhaustive list of problems with the

11  Debtor's proposed Plan.  Id.  The hearing on the Relief from Stay Motion was continued

12  for a variety of reasons until September 2, 2009.  Id.  At the hearing, the Court indicated

13  that it would continue the hearing on the Motion until October 27, 2009 to coincide with

14  the hearing to approve the Debtor's Disclosure Statement.  This Court further indicated

15  that it believed there were significant problems with the Debtor's proposed plan of

16  reorganization.

17

18  **G.    The Debtor's Second Plan and Disclosure Statement**

19

20          Despite hearing this Court's concerns regarding the viability of the First

21  Plan, the Debtor's Second Plan is virtually identical to its predecessor.  Essentially, the

22  Debtor seeks to pay Bank of America only a token below market amount for the five year

23  term of the plan – interest-only payments at a rate that is significantly below the market

24  rate of interest.  This fact alone is enough to conclude that the Second Plan is

25  unconfirmable on its face.  Moreover, other numerous problems with the Second Plan,

26  detailed below, also render the Second Plan unconfirmable.

27          Perhaps the only significant change in the Second Plan is the Debtor's

28  attempt to artificially impair Class 2.  In the First Plan, the Debtor proposed paying Los

1  Angeles County in full (approximately $167,000) on the effective date of the Plan, and the

2  class was unimpaired.  The Second Plan, however, proposes to pay only half of what is

3  owed to Los Angeles County on the effective date, and delays payment on the remaining

4  half until the third month of the Second Plan.  The motivation behind this change is clear –

5  by artificially impairing Class 2 by delaying payment for only a few months, the Debtor

6  attempting to receive the acceptance of that impaired class.  There is simply no rationale

7  for this delayed payment other than to artificially impair the class.

8

9  **H.     The Debtor's Ongoing Dispute From Daniel Swartz**

10

11          The contentious relationship between the Debtor's ultimate parent, Capri

12  Select Income II, LLC ("Capri") and the Property's original promoter, Daniel Swartz,

13  existed long before the Debtor's bankruptcy filing, and continues to take a toll on the

14  Debtor's ability to reorganize. See Application of Debtor and Debtor In Possession to

15  Employ Greenburg Traurig as Special Bankruptcy Counsel (the "Application") p. 3: 3-13;

16  p. 3: n.1.  Indeed, Capri and Swartz are currently embroiled in state court litigation

17  involving the loans made by Capri and Swartz's interference with the management of the

18  Property. See generally, Application.  Further, as set forth in the cover sheet to the Debtor's

19  bankruptcy schedules, the Debtor claims that Swartz is withholding books and records

20  which prevents the Debtor from completing all of its schedules of assets and liabilities. See

21  Cover Sheet to Debtor's Bankruptcy Schedules, Docket Entry No. 46 ("Cover Sheet").

22          An unlawful detainer action was commenced by Title Guarantee Building

23  Lessee, LLC against Swartz on April 24, 2009, in the Los Angeles Superior Court, Case

24  Number BC 412510.  Declaration of Stephanie M. Seidl In Support of Bank of America's

25  Opposition to Approval of Debtor's Second Amended Disclosure Statement ("Seidl Decl.")

26  ¶ 3.  Despite this filing, Swartz continues to reside in the building.  Seidl Decl. ¶ 4.  TGBL

27  filed a motion for summary judgment on or about October 15, 2009, and a hearing is

28

1    scheduled on this matter for October 26, 2009.  Id.  It is unclear when or if he will be

2    evicted from the premises.

3                                              **III.**

4                          **THE DISCLOSURE STATEMENT STANDARD**

5    **A.      The Debtor's Disclosure Statement Must Contain "Adequate Information"**

6

7              A Chapter 11 disclosure statement must contain "adequate information." 11

8    U.S.C. § 1125(a) defines "adequate information" as follows:

9               [A]dequate information' means information of a kind, and in
                sufficient detail, as far as is reasonably practicable in light of
10              the nature and history of the debtor and the condition of the
                debtor's books and records, that would enable a hypothetical
11              reasonable investor typical of holders of claims or interests of
                the relevant class to make an informed judgment about the
12              plan, but adequate information need not include such
                information about any other possible or proposed plan.
13

14   11 U.S.C. § 1125(a).  The disclosure level will vary depending upon the facts of the case.

15   See In re Aspen Limousine Service Inc., 193 B.R. 325, 334 (D.Colo. 1996); In re Copy

16   Crafters Quickprint, Inc., 92 B.R. 973, 979 (Bankr. N.D.N.Y. 1988).

17             In this case, the need for full disclosure at this juncture is critical for three

18   reasons. First, the feasibility of the Debtor's plan is inextricably linked to the Property's

19   ability to generate and sustain a certain level of rental income.  Thus, the basis for the

20   Debtor's projections must be set forth with enough specificity to enable a reasonable

21   investor to make an informed judgment regarding the assumptions contained in the plan.

22   Second, the Debtor has already informed the Court on several occasions that it does not

23   have access to the books and records that Swartz allegedly refuses to turn over.  Without a

24   clear understanding of what books and records the Debtor *does not* have access to, it's

25   unclear what the Debtor used to prepare the Second Plan and supporting exhibits.

26             Finally, the Court should look to the information contained in the Second

27   Amended Disclosure Statement that is before it now – rather than allowing the Debtor

28   additional time to further supplement or revise its Disclosure Statement.  As a single-asset

real estate case, the Debtor was subject to certain "fast-track" provisions of the Bankruptcy

Code, which were designed to force the case to quickly progress.  Thus, adequate

information should have been provided in the current version of the Disclosure Statement.

**B.**      **The Court Can Deny Approval Of A Disclosure Statement When A Plan Is
Unconfirmable On Its Face, Even If It Includes Adequate Information**

Regardless of whether the disclosure statement includes adequate

information, the court has the authority to deny approval of the disclosure statement when

it presents a plan that is unconfirmable on its face.  <u>In re United States Brass Corp.</u>, 194

B.R. 420 (Bankr. E.D.Tex. 1996); <u>In re Pecht</u>, 57 B.R. 137, 139 (Bankr. E.D.Va. 1986); <u>In
re Century Investment Fund VIII Ltd. Partnership</u>, 114 B.R. 1003 (Bankr. E.D.Wis. 1990).

This line of authority is directly applicable to the facts of this case. The Second Plan, like

the First Plan, is unconfirmable on its face.  It is well established that courts may consider

substantive plan issues at the disclosure statement hearing and deny approval to disclosure

statements predicated upon facially unconfirmable plans. <u>See</u>, <u>e.g.</u>, <u>In re Felicity Assocs.,
Inc.</u>, 197 B.R. 12, 14 (Bankr. D.R.I. 1996) ("It has become standard Chapter 11 practice

that when an objection raises substantive plan issues that are normally addressed at

confirmation, it is proper to consider and rule upon such issues prior to confirmation,

where the proposed plan is arguably unconfirmable on its face.") (internal quotations

omitted); <u>In re Market Square Inn, Inc.</u>, 163 B.R. 64, 68 (Bankr. W.D. Pa. 1994) ("Where

it is clear that a plan of reorganization is not capable of confirmation, it is appropriate to

refuse the approval of the disclosure statement."); <u>In re Dakota Rail, Inc.</u>, 104 B.R. 138,

145 (Bankr. D. Minn. 1989) (denying approval of "facially defective disclosure statement"

describing infeasible plan); <u>In re S.E.T. Income Props., III</u>, 83 B.R. 791, 794 (Bankr. N.D.

Okla. 1988) (denying approval of disclosure statement because "the disclosure statement . .

. demonstrates that the debtor's proposed plan of reorganization is not feasible").

1     Stated differently, it is well-established that a disclosure statement relating to

2 a plan that is facially not confirmable cannot be approved as containing "adequate

3 information" within the confines of section 1125 of the Bankruptcy Code. Specifically,

4 "[i]f the disclosure statement describes a plan that is so 'fatally flawed' that confirmation is

5 'impossible,' the court should exercise its discretion to refuse to consider the adequacy of

6 disclosures." In re E. Me. Elec.Coop., Inc., 125 B.R. 329, 333 (Bankr. D. Me. 1991) (citing

7 In re Cardinal Congregate I, 121 B.R. 760, 764 (Bankr. S.D. Ohio 1990)).  See also, In re

8 Allied Gaming Mgmt., Inc., 209 B.R.201, 202 (Bankr. W.D. La. 1997)

9 ("[N]otwithstanding adequate disclosure of information required by section 1125(b), a

10 disclosure statement should not be approved if the proposed plan, as a matter of law,

11 cannot be confirmed.").  As explained by the court in In re Petit:

12        As the approval of the adequacy of a disclosure statement is an
          absolute prerequisite to soliciting acceptances or rejections of a
13        plan of reorganization, a plan is in limbo until such approval is
          obtained.   A body of jurisprudence has developed which
14        suggests that notwithstanding adequate disclosure of
          information required by section 1125(b), a disclosure statement
15        should not be approved if the proposed plan, as a matter of law,
          cannot be confirmed.  The reasoning behind such holding is
16        obvious — the estate should not be burdened (both in terms of
          time and expense) with going through the printing, mailing,
17        noticing, balloting, and other exercises in the confirmation
          process where inability to attain confirmation is a fait
18        accompli.

19

20 In re Petit, 189 B.R. 227, 228 (Bankr. D. Maine 1995) (citing In re Allied Gaming Mgmt.,

21 209 B.R. 201, 202 (Bankr. W.D. La. 1997) (internal citations omitted)).  See also In re

22 Beyond.com Corp., 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003) (refusing to approve a

23 disclosure statement because the underlying plan was "patently unconfirmable"); In re

24 Mahoney Hawkes, LLP, 289 B.R. 285 (Bankr. D. Mass. 2002) (same); In re Silberkraus,

25 253 B.R. 890, 899 (Bankr. C.D. Cal. 2000) ("[W]here a plan is on its face nonconfirmable,

26 as a matter of law, it is appropriate to deny approval of the disclosure statement describing

27 the nonconfirmable plan."); In re O'Leary, 183 B.R. 338, 338-39 (Bankr. D. Mass. 1995)

28 ("Courts may refuse to approve disclosure statements that describe plans that cannot be

1  confirmed.").  Indeed, Section 1129(a)(11) requires that "courts scrutinize carefully the

2  plan to determine whether it offers a reasonable prospect of success and is workable."  In

3  re Beyond.com Corp., 289 B.R. 138, 145 (Bankr. N.D. Cal. 2003).

4

5                                    **IV.**

6                    **THE DISCLOSURE STATEMENT FAILS TO**

7                    **PRESENT ADEQUATE INFORMATION**

8

9              To the extent that the Debtor has failed to provide adequate information

10  because the Plan is unconfirmable, these arguments will be raised in the next section of

11  this Opposition.  Even aside from these arguments, however, the Second Amended

12  Disclosure Statement does not contain adequate information.  The primary deficiencies are

13  as follows:

14              First, the rental projections contained as Exhibit 6 of the Second Disclosure

15  Statement are baseless.  It is unclear where the Debtor obtained these numbers, or why the

16  Debtor believes these projections are realistic.  In fact, the most recent report prepared by

17  the Debtor's property management company tell quite a different, and much more dire,

18  story, as set forth in Section V.B below.

19              Second, the Disclosure Statement does not provide any evidence or

20  information what-so-ever regarding the financial stability of Title Acquisition, the entity

21  financially responsible for guaranteeing the payments to the Bank.  Rather, the Debtor

22  highlights the resources of Title Acquisition's parent company, Capri.  The financial

23  information for Capri has also not been provided as part of the Second Amended

24  Disclosure Statement.

25

26

27

28

W02-WEST:1SMS1\402246227.3                  -10-

**V.**

**THE DEBTOR'S SECOND PLAN IS PATENTLY UNCONFIRMABLE**

In essence, the Plan seeks a 5 year extension of the automatic stay during which time the Debtor will make interest-only payments (at a below-market interest rate) to Bank of America, and Bank of America's secured claim will not be amortized.  At the end of this 5 year period, under the Plan, the Bank's secured claim would mature, and presumably the Debtor would attempt to sell or refinance the Property at that time.[3]  It is clear that any loss in value of the Property during this time would fall solely on Bank of America, in that the Debtor could simply walk away after the 5 year period has expired if the Property cannot be sold or refinanced.  In a nutshell, Bank of America bears almost all the risk and is subjected to terms well below market.

The proposed Plan terms do not comply with the basic confirmation requirements under the Bankruptcy Code.  More importantly, however, is that the Debtor cannot and has not demonstrated that it could actually perform the obligations set forth in its non-complaint Plan.  ***The Debtor has offered nothing more than vague statements that it intends to perform its obligations under the Plan; there is no concrete evidence that this is actually possible.***

Respectfully, Bank of America should not be forced to participate in the Debtor's risky gamble that 1) the Debtor will somehow be able to perform its obligations under the Plan, and 2) the Property will ultimately be worth more than the substantial debt that currently encumbers it.  Based on the foregoing, and for additional reasons discussed in more detail below, the Debtor's Plan not only fails to comply with confirmation requirements but it is **not reasonably likely to succeed**.  As a result, Bank of America

---

[3] Unless otherwise defined herein, undefined capitalized terms have the same meaning as set forth in Bank of America's *Memorandum of Points and Authorities in Support of Motion for Relief from the Automatic Stay* which was filed with the Motion.

1  should be granted the relief requested in the Motion so that it may resume its efforts to

2  foreclose on the Property.

3

4  **A.    The Debtor's Plan is Not Feasible**

5

6          To have its plan confirmed, a plan proponent must demonstrate that the plan

7  is feasible.  11 U.S.C. § 1129(a)(11).  The purpose of the feasibility test under

8  § 1129(a)(11) is to prevent confirmation of plans amounting to "visionary schemes."

9  Matter of Pizza of Hawaii, Inc., 761 F.2d 1374, 1382 (9th Cir. 1985).  To find that a

10  proposed plan of reorganization is feasible, the bankruptcy court should be satisfied that it

11  is "more probable than not that confirmation of a plan would not likely be followed by

12  either a liquidation or further reorganization proceedings."  In re Lakeside Global II, Ltd.,

13  116 B.R. 499, 506 (Bankr. S.D.Tex. 1989).  When a debtor seeks to "cram down" a plan

14  on an objecting creditor, the debtor must establish feasibility by "clear and convincing

15  evidence".  In re Sloane, 57 B.R. 91, 92 (Bankr. D.S.C. 1985); Matter of National Awards

16  Manufacturing, Inc., 35 B.R. 691, 693 (Bankr. S.D.Ohio 1983).  In this case, Bank of

17  America strenuously objects to the Debtor's Second Plan.

18          ***A plan should not be confirmed when financial realities do not accord with***

19  ***a debtor's projections, or where a debtor relies on unreasonable assumptions.***  In re

20  Lakeside Global II, Ltd., 116 B.R. at 507 (emphasis added).  The Debtor must demonstrate

21  that its prospects for effective reorganization are well founded; speculative, conjectural or

22  unrealistic projections cannot support predictions of future performance.  Matter of Canal

23  Place, Ltd., 921 F.2d 569, 579 (5th Cir. 1991).  The Debtor must provide factual support

24  for any projections contained in the Plan.  In re Hobble-Diamond Cattle Co., 89 B.R. 856,

25  858 (Bankr. D. Mont. 1988).

26          In the present case, the Debtor fails to provide evidence regarding how it will

27  meet its projections and fund its Plan with the same cash flow which existed pre-petition.

28

1    In reality, the projections the Debtor submits are extremely unrealistic.  The Debtor simply

2    cannot service the Plan it proposes.

3                Submitted concurrently with the Reply to the Opposition to the Motion for

4    Relief from stay was the *Declaration of David Rifkind* ("Rifkind Declaration").[4]  Mr.

5    Rifkind, a senior real estate investment banker specializing in financing commercial real

6    estate, was retained to provide expert testimony in regards to the Property.  Rifkind Decl.

7    ¶ 1, 3.  In preparing his analysis, Mr. Rifkind reviewed the Motion, the Opposition, the

8    Plan, the Disclosure Statement, and the Debtor's appraisal, among other things.  Rifkind

9    Decl. ¶ 5.  Mr. Rifkind also toured the subject property, interviewed representatives of the

10   Property's management company, and extensively researched the current market for

11   stabilized apartment financing.  Rifkind Decl. ¶ 6.  Mr. Rifkind analyzed the plan and used

12   certain key assumptions provided by the plan documents to determine the availability, cost,

13   and structure of new financing equaled to the Debtor's projected value of the Property

14   upon stablization, $24,915,617.00.  Rifkind Decl. ¶ 7.  Mr. Rifkind also used the Debtor's

15   Net Operating Income assumption of $1,432,648, which was provided in the Debtor's

16   appraisal.  Rifkind Decl. ¶ 8.

17                Mr. Rifkind determined that there was no conventional debt financing

18   program that will provide 100% of the capital required to meet the value of $24,915,617.

19   Rifkind Decl. ¶ 9.  Further, Mr. Rifkind determined that there is no market for third lien

20   loans.  Rifkind Decl. ¶ 14.  As a result, the only available debt financing would be along

21   the following lines:

22                Debt Financing provides a portion of the capital required to meet the

23   $24,915,617 value. Rifkind Decl. ¶ 10.  Current parameters for capital sources that lend

24   against first trust deed (Senior) and subordinate financing (Mezzanine) are explained

25   below.  Id.

26   

27   _____
     [4]     A copy of this document is attached hereto as **Exhibit A** for the Court's
     convenience.

28

1    Senior Debt: Senior debt holds the superior claim against the collateral,

2  which in this case is the subject property. Rifkind Decl. ¶ 11.  The Senior Loan Parameters

3  in the current state of capital markets for this type of building are as follows: Fannie Mae 5

4  Year Program Pricing 6.5%, Amortization 30 Year, Debt Coverage Ratio of 1.35. Id.

5  Government Agency debt is the primary (and in many cases only) source to fund

6  apartment buildings in the current environment. Id.  For this reason, Mr. Rifkind uses

7  Fannie Mae, as set forth above. Id.  Given these parameters, the Maximum Possible Senior

8  Loan Proceeds would be $13,990,000.  Id.

9    Mezzanine Debt: Mezzanine debt is often secured in 2nd position behind the

10  Senior loan. Rifkind Decl. ¶ 12.  Because this debt is at higher risk it commands a higher

11  return than the Senior loan. Id. There are few groups that provide Mezzanine Debt

12  subordinate to a Fannie Mae Senior Loan, and Mr. Rifkind is in contact with these groups.

13  Id. The Mezzanine Loan Parameters are Pricing 13%, Interest Only, Debt Coverage Ratio

14  of 1.10. Id. Given these parameters, the Maximum Possible Mezzanine Loan Proceeds

15  would be $2,598,127.  Id.

16    Thus, the total debt (Senior + Mezzanine) proceeds would be $16,588,127.

17  Rifkind Decl. ¶ 13.  Mr. Rifkind concluded that based on assumptions contained in the

18  plan, this debt amount is what could be secured for this property in the present market.

19  Rifkind Decl. ¶ 14.   Given that the plan's assumed cash flow from the subject property's

20  operations as applied to a Debt Coverage Ratio of 1.10 (as calculated by dividing Net

21  Operating Income by Total Debt Service) by the Mezzanine Loan, there would be no

22  capacity to add a third trust deed subordinate to the Mezzanine Loan. Id.  Third trust deed

23  financing is uncommon and not an instrument that is possible in this case. Id.

24    In cases in which a given commercial real estate project provides a profitable

25  return beyond the cash flow and increased value necessary to service the debt financing,

26  New Equity financing can be applied to help bridge the gap between total debt available

27  and total project cost. Rifkind Decl. ¶ 15.  In this case, the amount of Equity to meet the

28  gap between the $16,588,127 of total debt available in the capital market today and the

1    provided valuation is equal to $8,711,215, calculated as follows: $24,915,617 *plus* Loan

2    Costs [5] of $383,725 *minus* $16,588,127 = $8,711,215. Rifkind Decl. ¶ 16.  Thus, in the case

3    in which a new party would attempt to arrange financing to acquire the subject property at

4    the value of $24,915,617, they would need to contribute $8,711,215 in addition to the

5    available debt financing.  Rifkind Decl. ¶ 18.

6              Based upon Mr. Rifkind's investigation into the capital markets for New

7    Equity investors, Equity investment providers in the capital markets today would require a

8    20% annual interest rate on the amount invested. Rifkind Decl. ¶ 19.  The amount on

9    which this 20% interest rate would be applied would accumulate if the 20% pricing was

10   not paid current during the period of a given year. Id.

11             As related to the subject property (even under the plan's assumptions,

12   property value, etc.), the current structure would allow for little cash left after paying the

13   Senior and Mezzanine Loans.  Rifkind Decl. ¶ 19.  The equity would have to be structured

14   as a near "zero coupon" with interest accruing until maturity. Id.  "Zero coupon" reflects a

15   structure in which there is no interest paid on the Debt or Equity financing prior to the

16   maturity date.  Id.  Given the New Equity investment of $8,711,215 accruing for 5 Years at

17   a rate of 20% per year, the amount required to pay back the New Equity Investment would

18   be $20,721,460. Rifkind Decl. ¶ 22.

19             Below is a list of the three components of the Capital Structure that would

20   reach the $24,915,617 value. Rifkind Decl. ¶ 23. This includes the Senior Loan,

21   Mezzanine Loan, and New Equity derived from the loan parameters and equity interest

22   rate mentioned in prior sections.  Rifkind Decl. ¶ 23.

23   **Senior Loan Proceeds:**  $13,990,000 at Pricing
                              6.5%, Amortization 30 Year

24
25   **Mezzanine Loan Proceeds:**  $2,598,127 at Pricing 13%,
                                 Interest Only

26

---

27   [5]    A summary of the Loan Costs is included in the Rifkind Declaration at paragraph
          17.

28

**New Equity:** $8,711,215 at Pricing 20%, accrued with a balloon at the end of year five.

The Senior Loan amount to be paid back at maturity is $13,096,176, as a portion of the principal from the original loan amount of $13,990,000 is paid off during the 5 Year term. <u>Rifkind Decl.</u> ¶ 25. The Mezzanine Loan amount to be paid back at maturity is $2,598,127, as only the interest on the principal amount outstanding was paid during the period of the loan. <u>Rifkind Decl.</u> ¶ 26. The Equity investment to be paid back is significantly higher than the original amount of $8,711,215, as this amount gained a 20% interest rate annually and had an accumulating principal balance. <u>Rifkind Decl.</u> ¶ 27.

The total amount to be paid back from the three components of financing (Senior, Mezzanine, Equity) that covered the value of $24,915,617 is $36,415,736, as follows:

| | |
|---|---|
| Pay Back Senior Debt Loan: | $13,096,176 (partially amortized over the 5 Year period) |
| Pay Back Mezzanine Debt Loan: | $2,598,127 (interest only) |
| Pay Back Equity Investment: | $20,721,460 (20% cumulative over 5 Years) |
| **Pay Back Total:** | **$36,415,736** |

<u>Rifkind Decl.</u> ¶ 28. The Plan of Reorganization states Sales Proceeds after 5-Years to be $26,283,747. <u>Rifkind Decl.</u> ¶ 29. This is $10,131,989 less than the amount necessary to pay back all capital sources. <u>Id.</u>

The weighted average cost of capital taking the three components mentioned above is 11.69% at inception, prior to any equity accrual. <u>Rifkind Decl.</u> ¶ 30. This cost of capital is inclusive of loan fees associated with originating Senior and Mezzanine debt,

1  which results in the amount of equity necessary being slightly higher than if Loan fees

2  were not charged against Loan Proceeds received by the borrower. Id. Accrual of the

3  principal amount of equity investment would significantly increase the weighted average

4  cost of capital over the duration of the project. Id.

5       In stark comparison to the weighted average cost of capital of 11.69% (at

6  inception), the Debtor proposes to pay 1-month LIBOR plus a spread of 200 basis points.

7  Rifkind Decl. ¶ 31(h).   As of August 25, 2009, 1-month LIBOR is 0.26 basis points,

8  making the debtors proposed interest rate 2.26%. Id. This illustrates a gap of 9.43% in

9  pricing between the debtor's proposal and the current market interest, even given the

10  plan's assumptions. Id.

11      The annual interest payment on the $24,915,617 value would be $2,912,635.

12  Thus, the Annual Debt Service (before principal amortization) would be $2,912,635.

13  Rifkind Decl. ¶ 31(d).  The Net Operating Income (taking the plan's assumptions as a

14  given) of the subject property at stabilization is provided to be $1,432,648, which leaves a

15  gap of $1,479,987 an annual basis. Rifkind Decl. ¶ 31(e).  It is important to note that the

16  Annual Debt Service amount would increase over the duration of the 5 Year period due to

17  the equity amount accruing, and thus cause the gap between current debt to be paid and

18  current income to widen.  Id.  The annual debt service including scheduled pay down of

19  the principal of the Senior Loan would be $3,064,370, which illustrates the widened gap

20  between annual debt service and net operating income.  Rifkind Decl. ¶ 31(g).

21      In summary, even using the Debtor's unrealistic assumptions, the Debtor's

22  plan fails financially on at least two major fronts: 1) the monthly debt structure would far

23  exceed the amounts required to be paid to the Bank, and 2) the amount necessary to repay

24  all outstanding amounts at the end of five years would fall short by at least $11 million.

25      Based on the foregoing, it is clear that the Debtor's plan is based on

26  "speculative, conjectural or unrealistic projections [which] cannot support predictions of

27  future performance." See Matter of Canal Place, Ltd., 921 F.2d at 579.  Accordingly, the

28

1  proposed Plan is neither feasible nor confirmable, and the relief requested in the Motion

2  ought to be granted.

3

4  **B.      The Plan Is Not Feasible Because The Debtor's Actual Income and Operating**

5  **Expenses Demonstrate That It Will Not Be Able To Service The Bank's Debt**

6

7          David Kegaries, the Bank of America officer responsible for the Loan, along

8  with his associate, Christine Lam, reviewed various monthly actual operating reports for

9  the Property prepared by Alliance Residential Company ("Alliance").  Kegaries Decl. ¶ 16.

10  Based on the review of the monthly actual operating reports, Mr. Kegaries and Ms. Lam

11  prepared an analysis of the income and expenses for the Property.  Kegaries Decl. ¶ 17.

12  Attached as Exhibit C to the Kegaries Decl. is the "Analysis Based on August 2009 Actual

13  Operating Statement for Income" (the "Debt Service Analysis") that was prepared.  Id.

14  Also attached to the Kegaries Decl. as Exhibit D is a chart, based on the monthly actual

15  operating reports, which summarizes the various operating expenses from June 2009 –

16  August 2009 and provides the average expenses for this three month period.  Id.

17          The Debt Service Analysis prepared annualizes the actual August 2009

18  income of the Property as reported by the Debtor's own property management company,

19  Alliance.  Kegaries Decl. ¶ 18.  Annualizing the August 2009 income is appropriate

20  because the Property is now at or near stabilized occupancy, based on the August 2009

21  operating report prepared by Alliance.  Id.  As a result, the annualized income based off

22  the actual reported income for August 2009 should provide a reasonable estimate as to

23  what the Debtor can expect to receive from operations if occupancy holds at current levels.

24  Id.

25          The expenses used in the Debt Service Analysis are also based on the

26  Debtor's actual expenses for August 2009.  Kegaries Decl. ¶ 19.  The monthly operating

27  statement for August 2009 did not include taxes or insurance.  Id.  As a result, to prepare

28  the Debt Service Analysis, Mr. Kegaries used the expenses for real estate taxes and

1  property insurance that were provided by Richard Jue, a licensed real estate appraiser.  Id.

2  These expenses are lower than those provided the Debtor's appraisal because they assume

3  Mills Act tax treatment for the Property.  Id.  If Mills Act tax relief is found to not be

4  available, taxes will be approximately $153,000 higher on an annual basis (as noted in the

5  Debtor's MAI estimate of annual operating expenses).  Id.  The Debt Service Analysis

6  exhibit includes a summary of the Debtor's appraisal's annualized expenses for reference.

7  Id.

8          As demonstrated by the Debt Service Analysis, the Debtor's actual expenses

9  when annualized are considerably higher than what was projected in the Debtor's appraisal.

10  Kegaries Decl. ¶ 20.  For example, annualized expenses based on Debtor's August 2009

11  operations are $1,082,644.  The Debtor's MAI expenses are only $832,123.  Id.

12  Accordingly, the difference is in excess of $250,000, an indication that the Debtor is not

13  able to efficiently operate the project.  Id.

14          The income for the Property is also significantly lower than the Debtor's

15  appraisal projected.  Kegaries Decl. ¶ 21.  The Debtor's appraisal projects a stabilized an

16  Effective Gross Income ("EGI") of $2,251,821, and a net operating income ("NOI") of

17  $1,432,648.  Id.  In contrast, when the Debtor's August 2009 actual numbers are

18  annualized, the EGI is $1,498,490 and the NOI is $415,846.  Id.  *Simply put, the Debtor's*

19  *projections are not in line with actual operations.*  Id.  Actual operations are most

20  indicative of future performance.  Id.

21          The financial reality facing the Debtor is grim.  Kegaries Decl. ¶ 22.  Based

22  on the annualized actual expenses for 2009,  the debt service coverage ratios were

23  calculated under two scenarios: 1) the Debtor's proposed interest rate of LIBOR + 200 bp,

24  which is approximately 2.3% today, and 2) the blended market rate of 11.69 % based the

25  analysis provided by David Rifkind.  Id.  Assuming interest only payments as the Debtor

26  proposed, the annual debt service payment would be approximately $523,296, with a debt

27  service coverage ratio of only 0.79.  Id.  The debt service payment of approximately

28  $523,296 is in excess of the NOI based on the annualized August 2009 income of

1    $415,846.  Id.  ***Thus, the Debtor would be unable to make the debt service payments***

2    ***required under the plan, even if the Debtor was allowed a rate substantially below the***

3    ***market rate of interest and was allowed to make interest-only payments.***  Id.  The debt

4    service payment assuming interest only payments, using the 11.69% blended market rate

5    of interest, are in excess of $2.65 million dollars – a staggering $2 million more than the

6    actual annualized NOI, and the debt service coverage ratio would only be 0.16.  Id.

7            Although the Debtor's proposed plan does not include amortization of the

8    debt, market terms for financing would require a 30 year amortization at a minimum.

9    Kegaries Decl. ¶ 23.  Using the Debtor's proposed interest rate and the actual annualized

10   NOI, this would result in debt service payments of $1,050,600 per year with a debt service

11   coverage ratio of 0.40.  Id.  Using the blended market rate of interest of 11.69% and a 30

12   year amortization, the debt service payments would be $2,743,382 per year with a debt

13   service coverage ratio of only 0.15.  Id.  The minimum debt service coverage ratio in this

14   market would need to be approximately 1.30 – 1.35.  Id.

15           Mr. Kegaries and Ms. Lam also calculated the debt service coverage ratios

16   based on the Debtor's annualized actual operating income and the Debtor's MAI expenses.

17   Kegaries Decl. ¶ 24.  The results of these calculations are also shown on Exhibit C to the

18   Kegaries Decl., and indicate that the Debtor would be unable to make the debt service

19   payments if the Plan was required to use a market rate of interest.  Id.

20           It is also important to note that the debt service coverage ratios and the debt

21   service payments that were calculated in Exhibit C were calculated using only the principal

22   balance under the loan, and did not use the higher aggregate amount due under the loan

23   documents.  Kegaries Decl. ¶ 25.  Had the aggregate outstanding amount been used, the

24   debt service payments would have been even higher and the debt coverage ratios would

25   have been even lower.  Id.

26           Based on the foregoing analysis, the Debtor's proposed plan is not feasible

27   because it fails to provide a market rate of interest and because the Debtor would not be

28   able to service the debt.  Kegaries Decl. ¶ 26.

1

2

3    **C.    <u>The Plan is Not Fair or Equitable</u>**

4            In order for the Plan to be confirmable, it must not discriminate unfairly and

5    must be fair and equitable.  <u>In re Bonner Mall Partnership</u>, 2 F.3d 899, 906 (9th Cir. 1993).

6    ("[T]he Code provides that where all requirements for confirmation but section 1129(a)(8)

7    are met, the bankruptcy court *shall* confirm a Chapter 11 reorganization plan over the

8    objection of an impaired class or classes "if the plan does not discriminate unfairly, and is

9    *fair and equitable,* with respect to each class of claims or interests that is impaired under,

10   and has not accepted, the plan.")

11

12       **1.    The Plan Unfairly Shifts the Risk of Failure to the Bank**

13

14           In order for a plan to be fair and equitable, "a plan of reorganization cannot

15   unfairly shift the risk of a plan's failure to the creditor."  <u>Aetna Realty Investors, Inc. v.</u>

16   <u>Monarch Beach Venture, Ltd.</u> (<u>In re Monarch Beach Venture, Ltd.</u>), 166 B.R. 428, 436

17   (C.D.Cal. 1993).  In so holding, the court in <u>In re Monarch Beach Venture, Ltd.</u> cited to <u>In</u>

18   <u>re Consul Restaurant Corp.</u>, 146 B.R. 979 (Bankr. D.Minn. 1992), where "the court

19   rejected a plan that would have distributed cash to a subordinated class while the senior

20   subordinating class remained unpaid."  <u>In re Monarch Beach Venture, Ltd</u>, 166 B.R. at

21   436.  As the court in <u>In re Consul Restaurant Corp.</u> explained,

22           The concept of fair and equitable involves more than an
             application of a mechanical calculation of absolute priority
23           based on distribution of property valued abstractly.  When the
             proposed distribution would substantially shift the risk of
24           failure of the plan from a junior class to a senior dissenting
             class for no legitimate purpose, the plan is not fair and
25           equitable to the dissenting class.

26

27   <u>In re Consul Restaurant Corp.</u>, 146 B.R. at 989 (<u>cited in</u> <u>In re Monarch Beach Venture,</u>

28   <u>Ltd</u>, 166 B.R. at 436).

1    Here, the Debtor seeks a 5 year extension of the automatic stay during which

2   time the Debtor will make interest-only payments to Bank of America, and its secured

3   claim will not be amortized.  The interest-only payments are well below market interest

4   rate.  The Debtor obviously hopes that the value of the Property will increase dramatically

5   over the 5 year repayment period, and that the Debtor (and not the Bank or any other

6   creditor) will be able to reap the benefits of any value increase.  Under the Plan, Bank of

7   America would not be able to foreclose on its collateral, even if the value of the Property

8   continue to decline.  In this event, the Bank could potentially be stuck foreclosing on the

9   Property five years from now for a value that is substantially less than the current value of

10   the Property.  As a result, the Plan unreasonably shifts the risk of failure to Bank of

11   America, and accordingly the Plan is neither fair nor equitable.

12    The case at bar is similar to that of <u>Federal Savings & Loan Ins. Corp. v. D

13   & F Construction, Inc.</u> <u>In re D&F Construction Inc.</u>, 865 F.2d 673 (5th Cir. 1989).  In that

14   case, the debtor obtained a loan for the purchase and construction of an apartment

15   complex.  (<u>In re D&F Construction Inc.</u>), 865 F.2d at 674.  When the debtor defaulted on

16   the loan, the bank began foreclosure proceedings, which were halted when the debtor filed

17   for bankruptcy.  <u>Id.</u>  The debtor filed a plan which provided the bank with (1) a new deed

18   of trust on the property, (2) the right to ½ of any net proceeds from the sale of the property,

19   (3) monthly payments on the debt, and (4) a balloon payment after 15 years.  <u>Id.</u>  The

20   monthly payments were initially not enough to cover the interest accruing, but the

21   principal amount owing would be reduced starting after 12 years of repayment.  <u>Id.</u>

22   Further, the plan contained provisions for the payment for five other classes of claims.  <u>Id.</u>

23    The court concluded that the debtor's plan was "neither fair nor equitable."

24   <u>In re D&F Construction Inc.</u>, 865 F.2d at 675.  Specifically, the court held that:

25   [the lender] did not lend its credit to this project on the strength
     of [the initial borrower's] fiscal integrity nor that of the debtor.
26   It furnished the funds that paid for constructing the apartments
     on the basis that it be given a right under Texas law to recover
27   the funds from the land and improvements if they could not be
     repaid as promised….  Yet, under the plan, [the Lender] cannot
28   exercise the foreclosure rights it reserved.  In addition, the

1      plan's negative amortization requires that for the first 12 years
2      [the Lender] increase its financing of this project and thus
   assume a worse financial position than it was in at the time of
3      confirmation…. Negative amortization coupled with deferring
   substantially all repayments of principal for fifteen years can
4      only be considered reasonable if one speculates that the present
   condition of the Fort Worth, Texas real estate market will
5      improve substantially. While this speculation may be wholly
   acceptable from the standpoint of the debtor and the other
6      classes of creditors, it is an altogether impermissible
   speculation from the standpoint of [the Lender] which is
7      effectively denied access to the security it contracted for during
   the next fifteen years and must furnish further funding to the
8      project.

9   In re D&F Construction Inc., 865 F.2d at 675-76.

10

11     Although the Debtor in this case intends to make payments to cover interest

12   (at a below-market rate), ***absolutely no amount of the principal will be repaid for 5 years.***

13   Further, the Plan restricts Bank of America's right to foreclose on the Property and thus the

14   Plan denies Bank of America "access to the security it contracted for" while partially

15   repaying unsecured creditors by giving them a large payoff on the Effective Date.

16     Moreover, the court in In re D&F Construction Inc. noted that if "market

17   conditions are such that an effective plan of reorganization cannot be developed that is fair

18   and equitable to dissenting creditors, [the Lender] is entitled to foreclose on its liens."

19   Given the market conditions, as set forth in the various appraisals and in connection with

20   the analysis provided by David Rifkind, an effective plan of reorganization cannot be

21   developed in this case, and the Bank should be allowed to foreclose on its collateral.

22

23     **2.**  **The Plan Violates the Absolute Priority Rule**

24

25     Section 1129(b)(2)(B) is a two-part codification of the judge-made absolute

26   priority rule, compliance with which was a prerequisite to any determination that a plan

27   was "fair and equitable" under the Bankruptcy Act. In re Bonner Mall Partnership, 2 F.3d

28   899, 906 (9th Cir. 1993). The absolute priority rule "prohibits the bankruptcy court from

1  confirming the Plan if any of the debtor's former equity holders retain any equity interest in

2  the estate without also providing to senior objecting creditors cash or other property equal

3  to the present value of their claim." In re Ambanc La Mesa Ltd. Partnership, 115 F.3d

4  650, 654 (9th Cir. 1997).  Moreover, "absolute priority is an implicit part of the "fair and

5  equitable" formula: the dissenting secured creditor must ordinarily be paid in full before

6  any junior class may share under the plan." Aetna Realty Investors, Inc. v. Monarch Beach

7  Venture, Ltd. (In re Monarch Beach Venture, Ltd.), 166 B.R. 428, 436 (C.D.Cal. 1993).  A

8  bankruptcy court departing from this standard must articulate the unusual and

9  extraordinary reasons for doing so.  Id.

10

11          a.       **The Debtor's Plan violates the absolute priority rule by paying**

12                   **unsecured creditors prior to paying secured creditors in full.**

13

14          The Debtor's Plan violates the absolute priority rule in at least three ways.

15  First, it pays unsecured creditors a pro rata share of the approximately $1.7 million

16  contributed by Building Lessee – which is approximately 50% of their allowed claims

17  according to the Debtor.  Plan p. 8.  This payment is made on the effective date of the plan,

18  while Bank of America is paid nothing on the principal and only monthly below-market

19  interest payments for a 5 year period following the effective date.  Because the "dissenting

20  secured creditor must ordinarily be paid in full before any junior class may share under the

21  plan," this scheme clearly violates the absolute priority rule.

22          In the *Memorandum of Points and Authorities in Support of Debtor's Second*

23  *Amended Plan of Reorganization* (the "Memorandum"), the Debtor argues that the

24  absolute priority rule does not apply to secured claims.  Indeed, the Debtor contends that

25  "Courts limit application of the "absolute priority rule to ***unsecured creditors***."

26  Memorandum p. 7: 4.  The Debtors do not cite a case for this proposition, but instead argue

27  that the case of Monarch Beach should be ignored because no court has followed the

28  rulings made by the Monarch Beach court.  Memorandum p. 8: 24.  Although Monarch

1   <u>Beach</u> may have not been explicitly followed, other courts have concluded that the

2   absolute priority rule applies to secured creditors.  For example, in <u>Miami Center</u>

3   <u>Associates, Ltd.</u> the Court addressed the exact same argument made by the Debtor in this

4   case:

5          The debtor argues that the absolute priority rule, which
           precludes equity interests from surviving where senior interests
6          have not been fully paid, is purely a creature of statute
           (§ 1129(b)(2)(B)(ii)), available only to unsecured creditors.
7          This Court (as well as several others) disagrees.  The absolute
           priority requirement is implicit in § 1129(b)(1) and (2),
8          imposing a "fair and equitable" standard on cram down plans.
           The fair and equitable requirement provides for an absolute
9          rule of priority among creditors and stockholders in
           reorganizations, placing secured creditors' rights first, those of
10         unsecured next, and subordinating the interests of stockholders.

11

12   <u>In re Miami Center Associates, Ltd.</u>, 144 B.R. 937, 941-42 (Bankr. S.D.Fla. 1992)

13   (internal quotations omitted).  Thus, there is a split of authority as to whether the absolute

14   priority rule prevents a debtor from paying junior classes ahead of secured creditors, and

15   thus the Debtor's statement that "no court other than the <u>Monarch Beach</u> court has [applied

16   the absolute priority rule to secured creditors]" is patently false.

17          In order to determine whether the payment requirements of absolute priority

18   rule should apply in this case, this Court should look to the treatment of the Bank in the

19   Debtor's Plan.  As explained in detail in this Opposition, the Debtor has not provided

20   market terms for the repayment of the debt to the Bank, and offers no analysis as to how

21   the Bank's claim will be paid when it matures after 5 years.  Under these circumstances,

22   this Court should apply the absolute priority rule as it was applied in <u>Monarch Beach</u> and

23   mandate that the Bank be paid in full prior to the junior classes receiving any payment.

24

25

26

27

28

1    **b.**    **<u>The proposed Plan violates the absolute priority rule by allowing</u>**

2    **<u>equity holders to retain an interest in the Property of the estate</u>**

3    **<u>while not paying 100% of the present value of the claims of</u>**

4    **<u>unsecured creditors.</u>**

5

6    Second, the proposed Plan violates the absolute priority rule in that it allows

7    equity holders of the Debtor to retain an interest in the Property of the estate while not

8    paying 100% of the present value of the claims of unsecured creditors. Further, the Debtor

9    cannot argue that the proposed Plan would satisfy the "new value" exception to the

10    absolute priority rule. In the Ninth Circuit a bankruptcy court may not approve a plan that

11    gives the debtor any interest in the reorganized estate unless the plan provides for the full

12    payments of claims of creditors in the objecting class, unless the owners contribute new

13    value substantially equivalent to the equity interest he retains. <u>See</u> <u>In re Tucson Self-</u>

14    <u>Storage, Inc.</u>, 166 B.R. 892, 899 (9th Cir. BAP 1994).

15    Notably, "*[t]he burden is clearly on the proponent of the plan to satisfy all*

16    *the requirements of the new value exception*." <u>Id.</u> (emphasis added). In order to qualify

17    for the new value exception, a plan must meet "all of the <u>Case v. Los Angeles Lumber</u>

18    requirements." <u>Id.</u> This means the capital contributed must be: (1) new; (2) substantial;

19    (3) money or money's equivalent; (4) necessary for a successful reorganization; and

20    (5) reasonably equivalent to the value or interest received. <u>Id.</u>; <u>see</u> <u>Case v. Los Angles</u>

21    <u>Lumber Products, Co., Ltd.</u>, 308 U.S. 106, 122-22 (1939), <u>reh'g denied</u>, 308 U.S. 637

22    (1939). In its Memorandum, the Debtor simply states that these requirements are met but

23    offers no analysis or facts whatsoever to support this claim. <u>See</u> <u>Memorandum</u> p: 10: 7-28,

24    p. 11: 1.

25    The Debtor does not offer any analysis or information regarding the value of

26    the equity interest that will be retained under the Plan by the Building Lessee or Title

27    Acquisition. Moreover, even if such analysis was provided, the equity interests that will

28    be retained cannot logically relate to the "new value" being contributed. Building Lessee

is contributing $1,712,535, and in turn is retaining a 15% equity interest.[6]  Title Acquisition is expected to make approximately $1,012,539 in contributions, approximately $700,000 less than Building Lessee, and yet remarkably will retain an 85% interest in the Debtor.  See Disclosure Statement p. 26-27.  Quite simply, the math does not add up, and thus the interests retained cannot be reasonably equivalent to the value provided. Moreover, because a successful reorganization will not occur in this case, the fourth Case Lumber factor can never bet met.

> **c.**    **The Debtor's Plan violates the absolute priority rule by not allowing for any competition to bid for the equity interests.**

Third, the Debtor's Plan also violates the absolute priority rule by providing that the old equity interest holders retain their equity interests without allowing for any competition to bid for the equity interests.  As the Supreme Court explained in Bank of America Nat'l Trust Association v. 203 North LaSalle Street Partnership, 526 U.S. 434, 458 (1999), "assuming a new value corollary, … plans providing junior interest holders with exclusive opportunities free from competition and without benefit of market valuation fall within the prohibition of § 1129(b)(2)(B)(ii)."  203 North LaSalle, 526 U.S. at 458. This is because the right to purchase post-petition equity is treated as an item of property in its own right.  203 North LaSalle, at 455.  The best way to determine value is exposure to the market.  203 North LaSalle, at 457.  The Debtor's Plan does not include any type of market exposure, and thus violates the absolute priority rule.

---

[6]    It's questionable whether the $1,712,535 Building Lessee is contributing constitutes "new value" because it is not originating from Building Lessee.  Rather, the Tax Investor under the Plan would provide this money to Building Lessee.  Moreover, the amount is not "new" – this amount remained to be contributed by the Tax Investor to the Building Lessee as of the Petition Date.  See Disclosure Statement p. 9: 4-9.

1          The Plan's violations of the absolute priority rule – by, among other things,

2   paying unsecured creditors in advance of a full payment to the Bank of America and

3   allowing equity holders to retain their interests without market competition while other

4   unsecured creditors are not paid in full – demonstrate that the Plan is not confirmable.

5          The Debtor argues in its Memorandum that <u>203 North LaSalle</u> should not be

6   interpreted in a strict or literal manner, and that exposure to outside investors would not be

7   easy to accomplish.  Respectfully, these arguments are without merit.  <u>203 North LaSalle</u>

8   provides a clear mandate that there be market exposure for the equity interests in the

9   Property.  That the Debtor finds accomplishing this task burdensome does not excuse

10  compliance with the Supreme Court's decision.

11

12       **3.        The Plan Does Not Provide Market Terms**

13

14         The Ninth Circuit has held that ***a secured creditor must receive interest***

15  ***during plan performance at the rate the debtor would have to pay for funds on the***

16  ***prevailing market.***  <u>In re Camino Real Landscape Maintenance Contractors</u>, 818 F.2d

17  1503, 1505 (9th Cir. 1987); <u>In re Boulders</u>, 164 B.R. 99 (9th Cir. B.A.P. 1994).  When the

18  parties disagree about the rate of interest, the appropriate rate is the rate the debtor would

19  pay a commercial lender for a loan of equivalent amount and duration, considering the risk

20  of default and the security for the loan.  <u>In re Dargahi</u>, 2008 Bankr. LEXIS 654 at *5

21  (Bankr. C.D.Cal. Mar. 3, 2008), <u>quoting</u> <u>United States v. Camino Real Landscape Maint.</u>

22  <u>Contr., Inc.</u>, 818 F.2d 1503, 1504-1506 (9th Cir. 1987).  <u>See also</u> <u>Tax Collector v. Pluma</u>

23  <u>(In re Pluma)</u>, 303 B.R. 444, 447 (B.A.P. 9th Cir. 2003) ("The court must consider the

24  prevailing market rate for a loan of a term equal to the payout period, with due

25  consideration of the quality of the security and the risk of a subsequent default.").

26         The Ninth Circuit has approved of the "formula approach" to determine the

27  appropriate market rate of interest.  This approach starts with a base rate and "adds a factor

28  based on the risk of default and the nature of the security."  <u>In re Pluma</u>, 303 B.R. at 447.

1    The base rate is the "rate that would be likely offered to a qualified borrower" in the

2    marketplace with a similar loan structure, taking into account the loan to value ratio, the

3    debt coverage ratio and the term. <u>In re Villa Diablo Assocs.</u>, 156 B.R. 650, 654 (Bankr.

4    N.D.Cal. 1993). The court must "assess the risks associated with a given debtor and the

5    security associated with a specific debt, but evidence of market interest rates for similar

6    loans is still relevant in arriving at the appropriate risk factor. <u>In re Fowler</u>, 903 F.2d 694,

7    698 (9th Cir. 1990). "The Ninth Circuit has specifically approved the formula approach

8    suggesting that the building of a formula rate is similar to the creation of a presumption

9    which can then be tested by the introduction of evidence regarding market rates in the

10    geographical area." <u>In re Villa Diablo Assocs.</u>, 156 B.R. at 653 (quoting <u>In re Fowler</u>, 903

11    F.2d at 698).

12        Evidence of market rates for similar loans is also relevant in arriving at the

13    appropriate Risk Factor." <u>In re Pluma</u>, 303 B.R. 444, 448 (B.A.P. 9th Cir. 2003). In <u>In re</u>

14    <u>Pluma</u>, the Ninth Circuit reversed the determination of the interest rate by the bankruptcy

15    court because the bankruptcy court failed to "consider any of the negative financial

16    attributes of this debtor relating to the risk of default." <u>Id.</u> at 449. When "there is a risk of

17    default…an appropriate factor must be added to the risk free rate to compensate for such

18    risk of default." <u>Id.</u> <u>See also</u> <u>In re Dargahi</u>, 2008 Bankr. LEXIS 654, at *9 (Bankr.

19    C.D.Cal. Mar. 3, 2008) (holding that "an additional 2% should be added on [to the base

20    rate of interest on the] account of risk factors such as loan history, tax liens, and lack of

21    cash reserves.").

22        The goal for the court is to arrive at a "market rate" of interest." <u>Tax</u>

23    <u>Collector v. Pluma (In re Pluma)</u>, 303 B.R. 444, 447 (B.A.P. 9th Cir. 2003). Moreover,

24    "[t]here is no authority for the proposition that the formula approach should result in a rate

25    more favorable to the debtor than resulting from an examination of the marketplace." <u>In re</u>

26    <u>Villa Diablo Assocs.</u>, 156 B.R. 650, 653 (Bankr. N.D.Cal. 1993). "The use of a formula

27    should only be a presumption…courts should always allow the parties to introduce

28    evidence of market rates to rebut the presumption." <u>Id.</u>

1    As set forth in great detail in Section V.A, the analysis provided by David

2  Rifkind firmly establishes that the Debtor has not provided a market rate of interest.

3  Specifically, the blended market rate for new financing is 11.69%. Rifkind Decl. ¶ 31(d).

4  Yet the Debtor proposes to pay interest (and no payment towards the principal) in the

5  amount of 1-month LIBOR plus a spread of 200 basis points.  Rifkind Decl. ¶ 31(h).    As

6  of August 25, 2009, 1-month LIBOR is 0.26 basis points, making the Debtor's proposed

7  interest rate 2.26%. Id.  This rate of interest is completely untenable in today's market, and

8  the Ninth Circuit has held that a secured creditor must receive interest during plan

9  performance at the rate the debtor would have to pay for funds on the prevailing market.

10  In re Camino Real Landscape Maintenance Contractors, 818 F.2d 1503, 1505 (9th Cir.

11  1987); In re Boulders, 164 B.R. 99 (9th Cir. BAP, 1994).  Because the Debtor's Plan fails

12  to provide a market rate of interest and all other appropriate terms, it cannot be confirmed.

13

14    **4.    Swartz's Continued Interference With the Property Further Renders**

15        **Reorganization Unlikely**

16

17    As the Debtor pointed out in its opposition to Bank of America's Motion for

18  Relief from Stay (the "Opposition"), Daniel Swartz "continues to significantly interfere

19  with and exercise control over the Debtor and the Property, and… disrupts the day-to-day

20  affairs of the Debtor." Opposition p. 14: 17-20.  Although the Bank recognizes that the

21  Debtor is not responsible for the problems caused by Swartz, the simple fact remains that

22  Swartz's continued interference with the Property will and has jeopardized the Debtor's

23  prospects for a reasonable and timely reorganization.  For example, the Debtor states in the

24  Second Amended Disclosure Statement:

25        Swartz did not turn over to Title Acquisition all of the Debtor's
         books and records and other information and data necessary for
26        the Debtor to administer, and address the compliance
         requirements of, this case, including those related to the
27        construction, loans or other business transactions between the
         Debtor and its vendors and other creditors.  Therefore, Title
28        Acquisition does not currently have in its possession a

complete set of the Debtor's books, records, information or other data pertaining to the Debtor or the Property. While Title Acquisition has been able to retrieve some information and data relating to the Debtor and the Property from every source possible, including third party sources, it is unknown whether such information and data are accurate, and, more importantly, whether such information and data are complete as it appears that Swartz may have improperly diverted funds and other assets which otherwise belong to the Debtor but were not properly reflected on any official record kept by or for the Debtor.

Second Amended Disclosure Statement p. 15: 15-27 – p. 16: 1. The Second Amended Disclosure Statement does not provide any indication as to how these problems will be resolved. Accordingly, it appears unlikely that the Debtor will ever have a complete set of accurate books and records for the Debtor. It also is clear that Swartz will continue to interfere with the management of the Property for the foreseeable future. As set forth above, Swartz continues to reside at the property and is not paying rent. An unlawful detainer action is pending, but it is not clear if this action will be successful. Thus, even if the Debtor's Plan could overcome current problems that render the current version of the – plan unconfirmable, the Debtor will *still* be unable to effectively reorganize in a reasonable period of time, if at all. As such, Bank of America's motion should be granted.

1

**VI.**

**<u>CONCLUSION</u>**

Based on the foregoing, Bank of America respectfully requests that the relief

requested in the Motion be granted.


Dated:  October 16, 2009

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP


By    _/s/ Stephanie M. Seidl_

STEPHANIE M. SEIDL
Attorneys for Creditor
GENERAL ELECTRIC
CAPITAL CORPORATION